**MELLON BANK, N.A., M. G. Buckeye Corp. and Mike Goldgar, Plaintiffs,**

v.

**AETNA BUSINESS CREDIT, INC., Defendant.**

**Civ. A. No. 75-1135.**

United States District Court,
W. D. Pennsylvania.

March 30, 1979.

---

Gilbert J. Helwig, and Robert K. Morris, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff Mellon Bank.

James H. Joseph and Donald S. Hershman, Pittsburgh, Pa., for plaintiffs Goldgar and Buckeye.

William C. O'Neil and David G. Ries, Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendant Aetna.

## OPINION

WEBER, Chief Judge.

This case, which is before the Court on cross-motions for summary judgment, involves the interpretation of a document known in the overlapping worlds of real estate development and high finance as a "Buy-Sell Agreement." The basic question is whether Defendant Aetna Business Credit, Inc., (Aetna) was obligated on August 1, 1975 to assume a loan of $1,850,000 made by Plaintiff Mellon Bank, N.A. (Mellon) to Plaintiff M. B. Buckeye Corporation (Buckeye) to finance the construction of an office building in Atlanta, Georgia.

Although there are many issues of fact, we do not find that these issues bar our consideration of the cross-motions for summary judgment. Each party has fully presented the documentary evidence, correspondence, and deposition testimony upon which it relies in responding to the mandate of F.R.Civ.P. 56(e), which requires that parties faced with a motion for summary judgment supported by adequate evidence may not rest on mere allegations but must bring

forth evidence of their own. Our analysis of these motions must solely involve our interpretation of the contract documents, unless it is necessary to consider extrinsic evidence to resolve ambiguities in the documents about the parties' intentions and expectations. We find the contract documents unambiguous and susceptible to our legal interpretation. Our reference to evidentiary matters is not made for the purpose of deciding issues of fact but rather to illustrate the consistency of extrinsic evidence with the legal conclusions which easily flow from a reading of the documents.

The undisputed facts, as set out in the exhibits and depositions which have been submitted to the Court, are as follows:

Plaintiff Mike Goldgar initiated the project of constructing the building in question by forming Buckeye Corporation, a Georgia corporation, in the fall 1973. In November 1973, Aetna made a "Permanent Commitment" to lend Buckeye $1,850,000 to pay off a construction loan (to be later obtained) after satisfactory completion of the building.[1] The existence of "Permanent Commitment", which expired on August 1, 1975, helped Goldgar to borrow the funds necessary to construct the building from Mellon, which agreed to become the interim lender in December 1973. Under the "Construction Loan Agreement" between Mellon and Buckeye, the debt was secured by a mortgage on the property and the building under construction and was personally guaranteed by Goldgar. The critical contract is the "Buy-Sell Agreement", which Mellon, Aetna, and Buckeye signed in January 1974. The requirements for Aetna's obligation to assume or fund the loan, in effect replacing Mellon as Buckeye's creditor, are principally set out in this document.

Construction began in the spring of 1974. After Mellon received requisitions from the general contractor, the bank made monthly loans to Buckeye. The "Construction Loan Agreement" provided for a fixed contract cost for the erection of the building of $1,350,000 maximum, with the difference between that sum and the $1,850,000 representing the cost of the land, fees, and other expenses as well as the interest on the loan. Interest was pegged to Mellon's prime rate and was deducted monthly from the amount of the loan proceeds remaining to be disbursed. By the late fall of 1974, Mellon officials realized that the remaining undisbursed funds would not suffice to complete the building. In December 1974, Mellon suspended payments to Buckeye's contractor. Because the contractor was not paid, construction stopped and the contractor and others filed liens against the premises. A default in the payment of interest also occurred. On February 5, 1975, Mellon notified Buckeye that, because of various events of default, including the nonpayment of interest, it was declaring the construction loan in default and demanding payment in full of both principal and interest from both Buckeye and Goldgar, the guarantors of the note. To cure these defaults and resume construction, Mellon agreed by a contract dated March 14, 1975 to advance another $305,000 to Buckeye, which sum was to be secured by a second mortgage on the premises, a pledge of all of Buckeye's outstanding stock and an assignment of all cash receipts.[2] Through the stock pledge, Mellon acquired full voting rights and control of Buckeye's board of directors and management. Richard N. Maier, a Mellon vice-president, became president of Buckeye and a director, and other Mellon employees assumed management positions, which they held until January 1976. The March 14 agreement expressly pronounced that the default in the payment of interest on the building was cured by the infusion of these additional funds and reinstated the building loan.

Before June 1975, representatives of Mellon and of Aetna met to discuss various problems with the deal. By letter of Joseph

---

1. Retaining a permanent lender first often makes it easier for a developer to obtain shorter term construction financing later.

2. Mellon made a further loan to Buckeye of $20,000 through an agreement dated July 21, 1975.

Jackovic, a Mellon vice-president, dated June 13, 1975, Aetna advised Mellon that its proposals to resolve the problems were unacceptable and that the loan would not be funded because the terms and conditions of the "Buy-Sell Agreement" could not be met by August 1, 1975. On July 25, 1975, Mellon forwarded to Aetna certain documents and proposed to transfer the loan to Aetna on August 1. Aetna rejected the tender by letter dated July 30, 1975. On September 2, 1975, Mellon sold the property at a foreclosure sale to a wholly-owned subsidiary for $940,000 as approved by a Georgia court order, McGanney Affidavit, Exhibit T.

Aetna admits that it refused to fund the loan but argues its refusal was justifiable because Mellon and Buckeye did not meet certain conditions precedent to its obligation to fund. Specifically, Aetna contends that its obligation to fund the loan was expressly contingent on the fulfillment of the following conditions precedent: (1) that the construction loan to Buckeye was not to exceed $1,850,000; (2) that the building loan and the guaranty thereof would not be in default at the time of tender to Aetna; and (3) that Buckeye present to Aetna an Estoppel Certificate and Mellon a warranty containing certain representations. In general, Mellon responds that the $1,850,000 limit applies only to the amount which Aetna may be demanded to fund and is not a condition precedent to Aetna's obligation to fund under the "Buy-Sell Agreement", and that none of the applicable loan agreements were in default at the time of its satisfactory tender of the loan to Aetna. Mellon moves for summary judgment against Aetna on the ground that Aetna repudiated its obligations to fund in anticipation of the August 1, 1975 transfer date. Mike Goldgar and Buckeye move for summary judgment on the same grounds.

 The resolution of the questions before the Court presented by the various motions for summary judgment involves the interpretation of the "Buy-Sell Agreement" and several other contracts entered by the parties. The interpretation and application of various contract provisions is the function of the Court if the provisions are unambiguous. *Goldinger v. Boron Oil Co.*, 375 F.Supp. 400, 413 (W.D.Pa.1974), aff'd 511 F.2d 1393 (3d Cir.) *cert. denied* 423 U.S. 834, 96 S.Ct. 59, 46 L.Ed.2d 52 (1975). In performing this function, the Court shall consider the writings without regard to extrinsic evidence if the contract may be construed within its four corners, *Robert F. Felte, Inc. v. White*, 451 Pa. 137, 302 A.2d 347 (1973), in order to discern and give legal effect to the reasonable expectations induced by the promises the parties made. *See* Corbin on Contracts, §§ 1, 543B, 560 (1950, Supp.1971).

[3] At the center of the many, complicated issues raised by the cross-motions for summary judgment is the concept in contract law of "conditions precedent", namely those operative facts which trigger the existence of some particular legal duty. Although it does not dispute that it signed an agreement to fund a $1,850,000 loan from Mellon to Buckeye, Aetna contends that it was not obligated to do so because certain conditions precedent to its obligation did not occur, for example, Mellon loaned Buckeye more than $1,850,000. Because of the powerful, disruptive effect of their failure to occur on the otherwise settled, serene expectations of the contracting parties, courts demand a particular clarity of expression of the parties of their intention to create a condition precedent before construing a contractual provision as a condition precedent, see generally, 5 Williston on Contracts § 665 at pp. 132–36 (1978 Supp.).

I. AETNA'S DUTY TO FUND WAS NOT SUBJECT TO THE CONDITION PRECEDENT THAT THE CONSTRUCTION LOAN TO BUCKEYE WAS NOT TO EXCEED $1,850,000.

Aetna contends that their duty to fund the loan was subject to the condition precedent that Buckeye's borrowings to complete construction would not exceed $1,850,000. To find such a condition, Aetna looks principally to the 4th whereas clause in the "Buy-Sell Agreement":

WHEREAS, the Seller (Mellon) proposes to make a loan or series of loans (the "Building Loan") to Borrower (Buckeye) in an amount not to exceed in the aggregate the principal sum of $1,850,000 to defray the cost of construction of the Improvements on the Mortgaged premises and related costs;

"Buy-Sell Agreement", p. 2. McGanney Affidavit, Ex. A.

Aetna argues that the foregoing language, when read with similar statements appearing in other documents, expresses the intention of the parties that Aetna was under no duty to fund if Buckeye borrowed more than $1,850,000 to complete construction. The parties do not dispute that Mellon loaned Buckeye an additional $305,000 in March 1975.

■ For several reasons, we find that Aetna's duty to fund was not subject to the condition precedent that Mellon not loan Buckeye more than $1,850,000. First, a plain reading of the "Buy-Sell Agreement" does not indicate that the parties reasonably intended to create such a condition precedent to Aetna's duty to fund. Reference to the debt limitation as a condition precedent is conspicuously absent from the 4th paragraph of the "Buy-Sell Agreement" which unmistakably sets out several conditions precedent in the language classically used to do so.

4. *Provided* the conditions of the Permanent Commitment and this Agreement have been complied with and title to the Mortgaged Premises shall be free and clear of . . . liens . . ., and a certificate of occupancy and such other certificates, permits or licenses which may be required by appropriate governmental authorities have been secured and a satisfactory final certified survey showing the location of all improvements on the Mortgage Premises without any encroachments from or on the adjoining property has been furnished Buyer (Aetna), . . . *and further provided* that the Improvements have been substantially completed according to the Plans as evidenced by the written certification of Borrower's (Buckeye) registered engineer or architect and, if required by Buyer (Aetna), as further evidenced by written Certification of Buyer (Aetna) . . . and in the absence of any default in the provisions of any of the Building Loan documents, *Buyer (Aetna) shall accept the tender* and assignment by the Seller (Mellon) of the Note, the Mortgage, the Assignment, the Guaranty, the Chattel Security and other collateral instruments, *and shall pay to the Seller (Mellon)* the amount then due in accordance with the Permanent Commitment, but not in excess of the amount then due and payable under the Building Loan.

"Buy-Sell Agreement", pp. 4, 5. (emphasis supplied).

If the parties intended to make any debt limitation on Buckeye a condition precedent to Aetna's duty to fund, it strains the Court's imagination to fathom why they failed to include the debt limitation in the above paragraph of conditions precedent, relying instead on an oblique reference in a whereas clause to memorialize their intent. The omission is especially striking in view of the fact that other statements made as recitals of the background of the transaction in whereas clauses were later substantially repeated as conditions precedent in the above paragraph. In the second whereas clause, for example, the parties state that Aetna is committed to loan Buckeye $1,850,000 upon the terms and conditions set forth in the "Permanent Commitment", and the necessity of complying with those terms and conditions is reiterated as a condition precedent in paragraph 4. The sixth whereas clause reflects the parties' understanding that Aetna will fund the loan after approving the completion of improvements on the premises but this recital is repeated as a condition precedent in paragraph 4. As a final example, in the seventh whereas clause the parties indicate their desire to complete the building free of liens on the premises, yet this recital is again

enunciated as a condition precedent in paragraph 4. In short, some recitals in the whereas clauses re-emerged later in the document as unmistakable conditions precedent, and some—like the one advanced by Aetna as a debt limitation—did not. Considering that the whereas clauses precede the language of covenant, the Court considers the repetition of certain statements as express conditions precedent to be more than redundancy. Such repetitions and omissions reflect a clear intention of the parties to raise some events to the status of conditions precedent and to acknowledge others merely as background to the transaction at hand. In sum, a plain reading of the "Buy-Sell Agreement" and the other loan documents indicates that the parties did not intend to subject Aetna's duty to fund to the condition precedent that Buckeye not borrow additional funds, and that Aetna, on the basis of the words the parties selected, was not reasonably justified in thinking that such a condition limited their obligations.

That some whereas clause recitals reappeared in the agreement as express conditions precedent undermines Aetna's contention that the statement in the 4th whereas clause, that Mellon plans to loan Buckeye "an amount not to exceed in the aggregate the principal sum of $1,850,000 to defray the cost of construction", constitutes a condition precedent to Aetna's duty to fund. The inclusion of the recital in the paragraph dedicated to conditions precedent would have required so little additional effort that we can attribute its omission only to a lack of intention among the parties to establish it as a condition precedent. The parties undoubtedly understood before they signed the "Buy-Sell Agreement" that the failure of Aetna to fund would clearly have a cataclysmic effect on the outcome of the whole transaction, and anticipated that cost overruns in construction contracts were not uncommon. In view of these factors, the Court must conclude that if the parties intended to establish a debt limitation as a condition precedent, they would have done so in a manner more emphatic than a passing reference in a whereas clause. It is difficult for the Court to accept that the parties would have sandwiched such a critical condition precedent among the financial banalities set out in the other whereas clauses.

The lack of emphasis given to words in the fourth whereas clause, which Aetna contends amount to a condition precedent that Aetna was not obligated to fund if Buckeye borrowed more than $1,850,000, attenuates the arguments Aetna makes to excuse the failure of the parties to express the borrowing limitation as a condition precedent in the "Buy-Sell Agreement." First, Aetna argues that an examination of several loan documents reveals that the parties intended to limit Buckeye's borrowings for the purpose of completing construction. Aetna points to provisions of the "Construction Loan Agreement" between Buckeye and Mellon which tracks the fourth whereas clause of the "Buy-Sell Agreement" in providing that Mellon's loan to Buckeye is:

> . . . not to exceed the aggregate sum of $1,850,000 to be used only for the payment of labor and material costs in the construction of the Improvements and for such other costs and expenses incidental to such construction . . .

"Construction Loan Agreement", ¶ 10; McGanney Affidavit Ex. H.

The above passage approximates the following provision from the Mellon Commitment letter, which the "Construction Loan Agreement" incorporates by reference:

> . . . [A]t all times the unborrowed balance of the Loan [for $1,850,000] shall be sufficient to fully pay the costs of completing construction of the Improvements . . .

"Mellon Commitment Letter", ¶ 13, McGanney Affidavit Ex. G.

Aetna argues that all of these excerpts chained together demonstrate that the parties agreed to subject Aetna's duty to fund to the condition precedent that Buckeye's borrowing not exceed $1,850,000. There are two flaws in this argument. First, the language in none of the documents even indi-

rectly says that Aetna's duty to fund is subject to a condition precedent that Buckeye's borrowings not exceed $1,850,000. The cited passages say far less, namely, that Mellon is not obligated to lend Buckeye more than $1,850,000 *under the agreements then in effect.* These passages indicate Mellon's understandable concern that Buckeye not interpret the construction loan documents to mean that Mellon is obligated to lend them any more than $1,850,000. Second, Aetna assumes that provisions of loan agreements involving only Buckeye and Mellon express—precisely and necessarily—the rights and obligations of Aetna who was not a signatory of them. Even if Aetna is given the full benefit of just the favorable inferences in other documents, the evidence of the parties' intention to subject Aetna's duty to fund to the alleged condition precedent is still grossly insufficient to overcome the failure of the parties to express such a condition precedent in the "Buy-Sell Agreement."

Aetna also argues that the Court should recognize a limitation on Buckeye's borrowing as a condition precedent, even if not set out directly, because such a limitation goes to the "economic heart of the transaction." Aetna Mem., p. 24. This argument is undermined by the deposition testimony of John Wadhams, a Senior Vice-President of Aetna, that Aetna's primary concern in evaluating prospective standby commitments is the appraised economic value of the completed building, Wadhams deposition, pp. 21–24, 30–31. Furthermore, Mellon Vice-President Richard Maier testified that Mellon had asked whether it would increase its funding obligation by $50,000 and that Aetna Vice-President Robert E. Lauschway replied:

> No. Our standby commitment was made based upon an appraisal of the economic value of the property; therefore, we can't increase it. Because by building a bigger foundation it doesn't give you any more square footage in the building to increase the economic value.

Maier dep., p. 56

This deposition testimony confirms our interpretation of the contract earlier set forth that a borrowing limitation as a condition precedent was not a reasonable expectation for either Mellon or Aetna. This testimony undercuts Aetna's related argument that it bargained for a debtor whose indebtedness was limited to $1,850,000 and that Mellon's additional loans unreasonably impaired Buckeye's creditworthiness. It seems clear that Aetna was primarily concerned in adjusting its standby commitment to the economic value the building would bring on the real estate market in the event of foreclosure and not to any slight fluctuations in Buckeye's indebtedness. Aetna believed, and reasonably so, that its primary security in the event of default would be the value of the building and not Buckeye's thinly capitalized assets, which practically approximated the amount of money advanced under Mellon's "Construction Loan Agreement." In addition, in making the argument that it bargained for a debtor with a particular indebtedness, Aetna is trapped by its failure to restrict Buckeye's borrowing in any of the agreements. Aetna tries to skirt this point by saying that there might have been some purposes, like the financing of tenant improvements, for which Buckeye could properly have assumed more debt but Aetna fails to suggest why such delicate limitations were not spelled out with the same abundant redundancy which characterizes other, far less consequential, terms and conditions.

## II. THE BUILDING LOAN AGREEMENTS WERE NOT IN DEFAULT AT THE TIME OF TENDER.

Aetna contends that its obligation to fund the loan was conditioned on the absence of defaults in the building loan documents. The "Buy-Sell Agreement" states:

> . . . [I]n the absence of any default in the provisions of any of the Building Loan documents, Buyer (Aetna) shall accept the tender and assignment by the Seller (Mellon) of the Note, the Mortgage, the Assignment, the Guaranty, the Chattel Security and other collateral instruments, and shall pay to the Seller the

amount then due in accordance with the Permanent Commitment. . . .

"Buy-Sell Agreement." ¶ 4. McGanney Affidavit, Exhibit A.

We agree with Aetna that the absence of default under the building loan agreements was a condition precedent to Aetna's duty to fund, but we disagree that its particular allegations of default justify its refusal to fund. First, Aetna contends that Mellon's additional loans to Buckeye constitute a default under the "Deed to Secure Debt", a building loan document, and thus discharge Aetna from its duty to fund. As an event of default, the "Deed" specifies:

. . . should Grantor (Buckeye) fail to keep, observe, perform, carry out and execute in every particular the covenants, agreements, obligations, and conditions set out in this deed, or in the Note, or in any of the following instruments given with respect to the Secured Indebtedness: loan commitment of Grantee (Mellon), construction loan agreement between Grantor (Buckeye) and Grantee (Mellon).

. . .

¶ 9 (vii); McGanney Affidavit, Ex. C. Aetna contends that the "Mellon Commitment" referred to above provides that the "construction mortgage loan" shall not exceed "the maximum aggregate principal amount of $1,850,000," Introductory paragraph and ¶ 1, McGanney Affidavit, Ex. G, and that the same document requires that construction costs of the building (exclusive of interest) on the loan not exceed $1,325,-000, id., ¶ 11. Aetna argues that the "Construction Loan Agreement" imposes a blanket limitation on borrowing by Buckeye, prohibiting Mellon from advancing to Buckeye more than $1,850,000 for the purpose of completing construction, "Construction Loan Agreement", ¶ 10, McGanney Affidavit, Ex. H. Aetna argues that Mellon's additional loans constituted defaults under these documents and thus were defaults under the "Deed to Secure Debt", a building loan document. Accordingly, Aetna argues that the additional loans discharged Aetna from its obligation to fund under the "Buy-Sell Agreement."

The Court does not believe that the additional Mellon loans constitute an event of default under the "Mellon Commitment" or the "Construction Loan Agreement." The plain meaning of these documents is that Mellon was obligated to lend Buckeye an amount of money not to exceed $1,850,000. As explained earlier, we cannot construe the above provisions to mean that Mellon and Buckeye agreed that Mellon could not loan Buckeye additional funds. Neither the "Mellon Commitment" or the "Construction Loan Agreement" explicitly state that Mellon was not to lend more money, and it is utterly implausible that Mellon and Buckeye would have tried to agree that they could not make other loan arrangements in the future. There is no provision in either the "Mellon Commitment" or the "Construction Loan Agreement" which would lead either Mellon or Buckeye to think that the other thought that the agreements obligated it to enter additional loan agreements in the future.

Second, Aetna contends that Buckeye's default in the payment of monthly interest in January and February 1975 discharged Aetna of its duty to fund because the defaults prevented Mellon from tendering to Aetna a loan free from default, as required by the "Buy-Sell Agreement." While the parties do not contest that the interest defaults occurred, they differ as to whether Mellon's advance of additional funds in March 1975 was effective to cure these defaults with respect to the requirements of the "Buy-Sell Agreement." Aetna argues that Mellon was prohibited by the "Deed to Secure Debt" from curing defaults in the payment of interest.

[Grantee (Mellon) may] pay any sums in any form or manner deemed expedient by Grantee to protect the security of this instrument or to cure any event of default other than the payment of interest or principal on Secured Indebtedness.

"Deed to Secure Debt", ¶ 9, second subparagraph (ii); McGanney Affidavit, Ex. C.

Aetna contends that this provision of the "Deed to Secure Debt", which neither Aet-

na nor Mellon signed, prevented Mellon's additional loans from curing earlier defaults. Again, we disagree. Nothing in the "Deed" prohibits Mellon from advancing new sums to Buckeye under new loan agreements, and Buckeye from using sums so advanced to cure interest defaults in earlier loans. Furthermore, no provision in the "Buy-Sell Agreement" or the "Permanent Commitment" so prohibits Buckeye and Mellon. Nor can we find such provision in the "Deed to Secure Debt" by implication of the reasonable intent or expectations of Buckeye, the signer of the Deed, and Mellon, who accepted the Deed.

Buckeye's obvious purpose in agreeing to the provision set out above was to prohibit Mellon from loaning them additional funds without their consent to pay delinquent interest. Buckeye clearly could have been justifiably averse to Mellon's unilateral imposition of further loans which might serve only to raise the indebtedness beyond the value of the building securing the loan and diminish the working capital of the company. No provision in the "Deed to Secure Debt" or the "Construction Loan Agreement" prohibits Mellon and Buckeye from freely agreeing to new loans.

Further, we note that the parties to the "Buy-Sell Agreement", on the basis of the language they selected, intended that past defaults under the building loan documents could be cured without discharging Aetna of its duty to fund, so long as no default existed in the building loan agreements at the time of tender. The "Buy-Sell Agreement" states that

. . . [I]n the absence of any default in the provisions of the Building Loan documents, Buyer (Aetna) shall accept the tender and assignment by the Seller (Mellon) of the Note . . . and shall pay to the Seller the amount then due. . . . At the time of payment as above provided, Borrower (Buckeye) agrees that it will execute a sworn estoppel certificate which Borrower certifies . . . that no default exists in the

terms of any of the lease documents executed and delivered simultaneously herewith . . .,

¶ 4, McGanney Affidavit, Ex. A.

The language clearly appears to refer to default at the time of tender and not, as Aetna argues to any past default which may have been cured before tender. The parties did not state for example, that Aetna shall accept the tender provided there has never been a default under the provisions of the building loan documents; if they had done so, the interpretation urged by Aetna would have more merit. In view of the language the parties actually selected, however, Mellon and Buckeye could have reasonably anticipated that defaults cured by the time of tender would not discharge Aetna from its duty to fund. Buckeye defaulted in interest payments in January and February 1975, and these defaults were cured in March 1975. As a matter of law, then, no interest defaults existed at the time of tender.

■ Third, Aetna contends that, after the first interest default in January 1975, another building loan document, Mike Goldgar's "Guaranty", was also in default and resulted in the discharge of Aetna's duty to fund the loan under the "Buy-Sell Agreement." After the interest defaults Mellon declared Buckeye in default under the "Deed to Secure Debt", under the "Construction Loan Agreement" and under "all of the documents entered in connection with that $1,850,000.00 loan by Lender (Mellon) to Borrower," which would include Goldgar's personal "Guaranty" of the indebtedness.[3]

The parties agree that Buckeye was in default under the "Construction Loan Agreement", that Mellon made and Goldgar received a demand under the "Guaranty", and that no payment was made. The parties also agree that Goldgar was in default under his "Guaranty" after he failed to pay the accelerated, entire principal and interest owing on the loan after default. Mellon

---

**3.** Letters dated Jan. 30, 1975 and Feb. 5, 1975, from Alexander Suto (Mellon's Georgia counsel) to Buckeye and Goldgar, McGanney Affidavit, Exhibits M and N.

argues, however, that Goldgar was no longer in default under the "Guaranty" after he applied advances from the March 14, 1975 loans to cure the defaults under the "Construction Loan Agreement." Aetna counters by reciting a provision from the "Guaranty" which, Aetna argues, provides that defaults in the Guaranty could not be cured.

> Guarantor hereby agrees that the Note may be renewed, extended, and rearranged in whole or in part, without notice to him, and that any renewal, extension or arrangement of the Note, in whole or in part, will not release the Guarantor and will not affect, diminish, lessen the obligation of the Guarantor hereunder or release the Guarantor from the payment of the Note or any renewal, extension, or rearrangement thereof, in whole or in part. Guarantor shall not have any rights of recourse against Lender or any subsequent holder of the Note. This Guaranty Agreement shall not be affected by reason of any action Lender or any subsequent holder of the Note may take or omit to take in connection with the Note or any document or collateral securing payment thereof.

Guaranty, ¶ 3, McGanney Affidavit, Ex. D.

Even when viewed most favorably to Aetna, this vague passage does not apply with any specificity to whether interest defaults under the "Guaranty" may be cured; rather, the passage cryptically refers to a careful preservation by Mellon of all rights it had against Goldgar to enforce the "Guaranty" in court. Rather than sue Goldgar on the "Guaranty", Mellon made a business decision to try to "work out" the deal, by taking control of Buckeye and by agreeing to increase indebtedness.[4] We hold that

this course of action had the effect of curing or relieving any default which may have arisen under the "Guaranty" and of waiving any cause of action under the "Guaranty" Mellon had against Goldgar by reason of the interest defaults.

## III. MELLON AND BUCKEYE WERE ABLE TO TENDER PROPERLY.

■ By letter dated July 25, 1975, Mellon purported to tender to Aetna certain documents necessary to transfer the loan to Aetna, including unexecuted form of the "Estoppel Certificate" from Buckeye and the "Warranty" from Mellon, as required under the "Buy-Sell Agreement." Aetna argues that a proper tender of documents was a condition precedent to its duty to fund, and that Buckeye and Mellon were unable to tender the "Estoppel Certificate" and the "Warranty" without material deficiencies. For the reasons set out below, we disagree.

Buckeye was required to furnish a sworn certificate, in which Buckeye would certify:

> . . . the total amount of loan which has been disbursed to the Borrower or for the Borrower's account, that the Note, the Mortgage, the Assignment, and the Guaranty executed to Buyer [Aetna] are valid without any setoff or counterclaims and that no default exists in the terms of any of the loan documents executed and delivered simultaneously herewith and further that no other matter exists which might affect the validity of the Note, the Mortgage, the Assignment, the Guaranty or other collateral instruments.

"Buy-Sell Agreement", ¶ 4, McGanney Ex. A.

First, Aetna asserts that Buckeye could not properly provide an estoppel certificate

---

4. Aetna contends in rebuttal that the final paragraph of the "Guaranty" "summarizes [its] absolute character" such that the March 14 loan did not cure defaults under the "Guaranty".

> Neither the release of any security securing payment of the Note or the indebtedness evidenced thereby, or any amendments, *renewals*, extensions or rearrangements thereof shall *affect, diminish, lessen* or release the guarantor from any of his obligations hereunder.

Totally unrelated to the issue of the curability of defaults in the "Guaranty", the passage tells Goldgar *not* to interpret adjustments of the "Construction Loan Agreement" as modifications of his obligations under the "Guaranty." There is nothing about this passage inconsistent with a later agreement by Mellon and Buckeye to work out the loan and cure the interest defaults.

because the certificate was supposed to have been provided by an "independent" borrower, which Buckeye allegedly was not after Mellon advanced additional funds on March 14, 1975 and gained control of Buckeye. Essentially, Aetna argues that Mellon proposed to transfer an estoppel certificate executed in form by Buckeye but in fact by Mellon due to the presence of Mellon employees on Buckeye's board and in its management.

Mellon responds that the "Buy-Sell Agreement", which required Buckeye to provide the "Estoppel Certificate", does not require any degree of independence on the part of Buckeye. Aetna can point to no contractual provision which can even be construed to impose as a condition precedent that Buckeye be independent of Mellon. Nor is it surprising that no such provision exists. At the time the "Buy-Sell Agreement" was signed, Aetna had no demonstrable interest, and apparently no concern, in having Buckeye independent of Mellon, and such independence is wholly irrelevant to Aetna's prime articulated concern in entering the transaction, namely, that the appraised value of the completed building provide sufficient security for its "Permanent Commitment." In requiring Buckeye to furnish the "Estoppel Certificate", Aetna obviously sought to preserve a set of legal remedies in case the loan documents underlying its possible causes of action against Buckeye were invalid. The legal protection afforded Aetna under the "Estoppel Certificate" is not diminished by the involvement of Mellon's personnel in Buckeye's management.[5] Accordingly, independence on the part of Buckeye as a condition precedent to Aetna's duty to fund is neither required by the language of the "Buy-Sell Agreement" nor implied by the parties' reasonable expectations.

Second, Aetna argues that the form of the "Estoppel Certificate" sent by Mellon omitted to certify that "no other matter exists which might affect the validity of the

. . . Guaranty . . .", although it certified all of the other building loan documents, "Buy-Sell Agreement", ¶ 4. Aetna alleges that Mellon knew the "Guaranty" was invalid because when Mellon took stock in pledge pursuant to the March 14 separate loans, it knew that Goldgar did not personally own the Buckeye stock and, consequently, that the recitation of consideration made by Goldgar in the "Guaranty" was false.

The "Guaranty" states:

Guarantor hereby represents that he is the owner of a substantial percentage of the outstanding capital stock of Maker, and hereby expressly recognizes that Lender would not have permitted the indebtedness evidenced by the Note to have been created except for and unless Guarantor will receive a direct and material benefit from the creation of such indebtedness and that such benefit constitutes full, fair and adequate consideration for the execution and delivery of this Guaranty Agreement by Guarantor.

"Guaranty", ¶ 10, McGanney Aff., Ex. D. In fact, the stock of Buckeye Corporation was owned by the Four D Trust, a trust which Goldgar had earlier established for his children, Goldgar dep. I, p. 18. Although he was neither a trustee nor beneficiary at the time, Goldgar viewed himself as the beneficial owner of the stock because he created the trust with the stock as its corpus and his children as the beneficiaries, *id.* at pp. 178–80.

The "Guaranty" is not invalid merely because Goldgar's interpretation of trust law and his use of its terminology may be inaccurate. The recitation of consideration in the cited provision fundamentally represented the essence of the transaction, namely, that Goldgar was to receive a "direct and material benefit" from the loan agreement. Quite clearly, Goldgar received such a benefit. Goldgar conceived the real estate venture and arranged its financing. We do not delve into Goldgar's compensa-

---

**5.** In a sense, Mellon's participation in Buckeye's management enhanced Aetna's position in the event the documents were invalid or a default existed by possibly enabling Aetna to satisfy any resulting judgment from Mellon's superior assets.

tion as developer to observe that Buckeye's profits could accrue directly to his children and thus result in a "direct and material benefit" to him. In view of these circumstances we would be naive to overlook the coincidence of Goldgar's personal interests with those of his children. Goldgar bargained for this consideration and received it in exchange for his personal guaranty. Thus, Buckeye could have legitimately certified in the certificate that no matter existed which materially affected the validity of the "Guaranty." [6] To be sure, Aetna's finely reasoned contention about the validity of the "Guaranty" fails as a material, meritorious justification for Aetna's refusal to fund since Aetna consistently looked to the appraised value of the building, and not to Goldgar's personal assets, as security for its loan.

Third, Aetna argues that Buckeye's tender was improper because Buckeye did not certify that the loan did not exceed $1,850,000. As discussed earlier, Mellon's additional loans did not violate any condition precedent to Aetna's duty to fund and, consequently, Buckeye's inability to certify that it borrowed only $1,850,000 does not prevent a sufficient tender.

Fourth, Aetna contends that on August 1, 1975, Buckeye could not certify that particular loan documents were valid without setoff or counterclaim against Mellon, as required by the "Buy-Sell Agreement," ¶ 4. Mellon, Aetna asserts, had notice of claims that Goldgar could make against it. Mellon's alleged notice, however, viewed most favorably to Aetna, amounts only to a suspicion that a discontented Goldgar might make some frivolous claim, see, e. g. Maier dep., pp. 150–51; White dep., p. 48. We agree with Mellon that the reasonable interpretation of the relevant provision of the "Buy-Sell Agreement" is that Buckeye need only certify in good faith that no legitimate material claims could be made against Mellon.

Aetna neither alleges nor proves that either Goldgar or Buckeye actually brought or could have brought any setoffs or counterclaims against Mellon that were legitimate and material. Mellon's alleged notice was seemingly confined to a feeling on the part of certain employees that Goldgar, if possessed of a litigious mind, might find some frivolous contention to make. Furthermore, as part of the March 14, 1975 additional loan agreements, Goldgar released Mellon and its employees from liability for conduct not amounting to malfeasance or gross neglect in their management of Buckeye, Mannix Affidavit, Ex. X. Accordingly, Buckeye could have properly certified that the building loan documents were "valid without any setoff or counterclaim . . . ." Absent adequate evidence that such claims or their bases actually existed, speculative arguments about whether Goldgar's possible claims were legitimate or frivolous and the legal effect of the releases are not enough to relieve Aetna of its duty to fund.

Finally, Aetna contends that Buckeye could not certify, as required by ¶ 4 of the "Buy-Sell Agreement", that there was no default under the building loan documents and that Mellon could not provide a warranty, as required under ¶ 3 of the "Buy-Sell Agreement", that "no default exists" under the documents to be assigned at closing. For the reasons set out in the previous section, we do not believe that Aetna has shown, as a matter of law, that the building loan documents were materially in default at the time of tender, and, hence, we reject Aetna's contention that Buckeye could not have certified and that Mellon could not have warranted that the building loan documents were not in default on August 1, 1975, when tender was due.

 For the reasons set forth above, Aetna's motion for Summary Judgment is denied. Aetna consistently asks the Court to

---

**6.** The Court emphasizes that this finding applies only to the issue of whether Goldgar could have certified that the "Guaranty" was valid on August 1, 1975. It does not apply to, and offers no indication of the Court's attitude about, the related issue of whether Goldgar's statements that he "owned" stock in Buckeye and similar companies when in fact the shares were held in trust are material misrepresentations of his financial condition.

read into the applicable contracts those provisions which Aetna could and should have spelled out thoroughly in the "Buy-Sell Agreement" and the "Permanent Commitment" to protect the expectations which it alleges it had when those agreements were signed. As the result of declining property values in the Atlanta area, Aetna was understandably reluctant to fund a $1,850,000 loan secured by property worth less than $1,000,000. We cannot re-write critical documents, however, freely signed by parties of equal strength, to free Aetna of the obligations it knowingly assumed.

Aetna also moves for partial summary judgment against both Goldgar and Buckeye and provides the Court with a panoply of reasons involving Aetna's liability to these Plaintiffs as well as limitations on any damages which they could recover. In their Complaints, both Goldgar and Buckeye seem to allege that, if Aetna had funded, Buckeye would have succeeded, Buckeye's loan to Mellon would have been paid, and Goldgar would have re-gained control of a profitable real estate enterprise. Both also argue that Aetna's failure to fund tarnished their business reputations.

Aetna moves for summary judgment against Goldgar on the grounds that Goldgar, as an individual, has no claim against Aetna. It argues that Goldgar was never a shareholder of Buckeye, and was not involved in its active management in August 1975, the time of Aetna's allegedly wrongful refusal to fund, even though he served nominally as director and assistant secretary. While Goldgar negotiated the "Permanent Commitment" with Aetna, it appears that he did so as President of Buckeye and not as an individual. Goldgar contends that during these negotiations he advanced money to Buckeye out of his personal funds. However, as long as he did so as President of Buckeye, his personal advances do not provide him with a cause of action against Aetna, although they may provide him a claim against Buckeye. Even though Buckeye was largely Goldgar's alter ego and Goldgar personally guaranteed the loan Aetna was to receive, it appears that Goldgar was acting for Buckeye during all his

dealings with Aetna, and Buckeye is a Plaintiff in this action. Accordingly, it is difficult to see what duty Aetna owed Goldgar as an individual. We note that any damages which Goldgar may have sustained as a result of his removal from the presidency of Buckeye seem attributable to Mellon, not Aetna. However, giving Goldgar the benefit of all barely reasonable inferences, we do not believe that the present state of the record allows us to grant partial summary judgment against Goldgar. These issues may be better considered on a motion for directed verdict after a full presentation of the Plaintiffs' case.

 Aetna has also moved for partial summary judgment against Buckeye. On the record provided, Buckeye's position is stronger than Goldgar's because Buckeye indisputably entered contracts with Aetna. For example, Aetna's failure to fund may be considered a breach of the "Buy-Sell Agreement". We note, however, that the claims of both Goldgar and Buckeye as to both liability and damages are infested with speculation about the potential profitability of an office building without any profit history in Atlanta's admittedly unstable real estate market in 1975 which has not been fully developed on the record presented to the Court. Expert testimony on this issue which serves only to limit the range of the jury's speculation is inadmissible, *see American Air Filter Co. v. McNichol*, 527 F.2d 1297 (3d Cir. 1975); *see also Weinglass v. Gibson*, 304 Pa. 203, 155 A. 439 (1931); *Western Show v. Mix*, 308 Pa. 215, 162 A. 667 (1932); *Eazor Express, Inc. v. Int'l. Bhd. of Teamsters*, 520 F.2d 951 (3d Cir. 1975); *McBrayer v. Teckla, Inc.* 496 F.2d 122 (5th Cir. 1974); *Neville Chemical Co. v. Union Carbide Co.*, 422 F.2d 1205, 1225–27 (3d Cir. 1970), *cert. den.* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). In sum, because the Court is not reasonably certain there is no triable issue of fact and because the issues which may be ripe for summary judgment are intertwined with others which must be tried, *see* 6 pt. 2 Moore's Federal Practice ¶ 56.15[8] at pp. 56–642 thru 56–644, Aetna's Motions for Partial

Summary Judgment against Goldgar and Buckeye are denied.

Remaining are the Motions of Buckeye, Goldgar and Mellon for Summary Judgment. The basis of these Motions is quite simply, that Aetna was under a duty to fund the loan through the "Permanent Commitment" and "Buy-Sell Agreement" and that Aetna refused to do so. Aetna responds that it has several affirmative defenses which, if proven, excuse its failure to fund and support its counterclaim. Some of these affirmative defenses—for example, the purported $1,850,000 lending limitation—present issues of contract interpretation already decided in this Opinion and, accordingly, will not be available to Aetna at trial. In contrast, other affirmative defenses, like Aetna's allegations that Goldgar made serious misrepresentations of his creditworthiness in financial statements which Aetna relied upon in granting his application for the "Permanent Commitment", clearly present genuine issues of material fact requiring the Court to deny the remaining Motions for Summary Judgment and to allow their consideration at trial.

In support of its Motion for Summary Judgment, Mellon argues that the fraudulent statements made by Goldgar to Aetna do not preclude Mellon from recovering damages from Aetna under the rule that the fraud of a third party, inducing one party to enter a contract, will not discharge that party from performing its obligations under the contract, provided that the party to whom the duty is owed did not know of the fraud and acts in good faith, see, e. g. Blum v. William Goldman Theatres, 164 F.2d 192 (3d Cir. 1947). Mellon contends that since it never knew of Goldgar's fraud, Aetna remains liable to Mellon on the "Buy-Sell Agreement" even though Goldgar may be liable to Aetna for misrepresentations in the application for the "Permanent Commitment."

In the authorities cited by Mellon, the defrauding party merely induced one party to enter a contract with another. According to the allegations here, however, Goldgar did much more. Goldgar allegedly used fraud to weave a web of contractual relationships involving Aetna, Mellon, and himself. Goldgar allegedly made fraudulent representations to induce Aetna to enter the "Permanent Commitment" to obtain permanent financing, to be sure, but also to make it easier for him to obtain construction financing from Mellon. Goldgar then joined hands with Aetna and Mellon in entering the "Buy-Sell Agreement", which coordinated the financing of Mellon and Aetna, and which, for the first time exposed Aetna to liability to Mellon for wrongfully refusing to fund.

At the foundation of the "Buy-Sell Agreement" was the "Permanent Commitment." One of the terms and conditions of the "Permanent Commitment" was Goldgar's representation that the materials he submitted with his application were true and correct, and were supplied with the intent to induce Aetna to provide permanent financing, ¶ 15, McGanney Affidavit, Ex. B. Mellon entered the "Buy-Sell Agreement" with notice of these conditions because the "Permanent Commitment was appended thereto as Exhibit B. Rather than superceding the "Permanent Commitment", the "Buy-Sell Agreement", which embodies the relationship between Mellon and Aetna, expressly required compliance with the "Permanent Commitment" as a condition precedent to Aetna's duty to fund, ¶ 4, McGanney Affidavit, Ex. A. Accordingly, any fraud by Goldgar in inducing Aetna to enter the "Permanent Commitment" also infects the "Buy-Sell Agreement" and discharges Aetna of all of its obligations under the agreement, including those to Mellon.

Accordingly, the Motions of Buckeye, Goldgar, and Mellon for Summary Judgment are denied.

Because triable issues of fact remain, the foregoing Opinion does not terminate the case. The following principles are set out under Fed.R.Civ.P. 56(d) to govern further proceedings, and are necessarily limited to those contentions made by the parties in support of their motions for summary judgment.

1. As a matter of law, Aetna's duty to fund was not subject to the condition precedent that the loans to Buckeye for the purpose of completing construction not exceed $1,850,000. Aetna may not raise the issue of debt limitation as a defense at trial.

2. As a matter of law, the "Building Loan Agreements" were not in default at the time of tender, and Aetna may not raise this contention as a defense at trial.

 (a) Mellon's additional loans to Buckeye do not constitute a default under the "Deed to Secure Debt", and hence do not discharge Aetna of its duty to fund.

 (b) The interest defaults in January and February 1975, as cured in March, did not discharge Aetna of its duty to fund.

 (c) The March 1975 advances cured defaults in the "Guaranty" created by the interest defaults in January and February 1975.

3. As a matter of law, Mellon and Buckeye were able to tender properly, and Aetna may not raise the issue of improper tender as a defense at trial.

 (a) Mellon's participation in Buckeye's management did not prevent Buckeye from providing Aetna with a proper "Estoppel Certificate."

 (b) Goldgar's representation in the "Guaranty" that he owned stock in Buckeye did not prevent him from certifying that no matter existed which materially affected the validity of the "Guaranty."

 (c) The inability of Buckeye to certify that construction loans did not exceed $1,850,000 did not preclude Mellon from tendering the loan properly.

 (d) According to the evidence provided, Buckeye could certify that the "Building Loan Documents" were valid without legitimate setoff or counterclaim against Mellon.

4. Aetna's allegations of fraud by Goldgar in his financial statements submitted with his application for the "Permanent Commitment", the materiality of the alleged misrepresentations, and Aetna's reliance upon them present genuine issues of material fact. As a matter of law, Aetna's reliance upon materially fraudulent statements by Goldgar in entering the "Permanent Commitment" will discharge Aetna of its obligations under the "Permanent Commitment" and under the "Buy-Sell Agreement" to Buckeye, Goldgar, and Mellon.

5. Aetna may raise at trial other defenses properly pleaded which present issues of fact.