MELLON BANK, N. A., M. G. Buckeye Corp. and Mike Goldgar, Plaintiffs,

v.

AETNA BUSINESS CREDIT INC., Defendant.

Civ. A. No. 75–1135.

United States District Court, W. D. Pennsylvania.

Nov. 3, 1980.

Donald S. Hershman, John R. Friedlander, Pittsburgh, Pa., for M. G. Buckeye Corp. and Mike Goldgar, plaintiffs.

Thomas Johnson, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for Mellon Bank N. A.

David G. Ries, Thorp, Reed & Armstrong, Pittsburgh, Pa., for Aetna Business Credit.

## OPINION

WEBER, Chief Judge.

This case is before the Court on a Motion for Summary Judgment by Defendant Aetna Business Credit, Inc., on the claims asserted by Plaintiffs Buckeye Corporation and Mike Goldgar involving the interpretation of a document known as a "Buy–Sell Agreement." By our prior order of March 30, 1979, we denied Summary Judgment on cross motions of the parties, but we established questions of law to govern any trial under the provisions of Fed.R.Civ.P. 56(d). See: *Mellon Bank, N. A. v. Aetna Business Credit, Inc.*, 468 F.Supp. 656 (W.D.Pa.1979). Aetna's current motion for Summary Judgment is directed solely to the claims of Goldgar and M. G. Buckeye Corp. and is basically in the nature of a motion in limine to either produce a pretrial ruling by the Court governing the admissibility of evidence to support the various claims made by plaintiffs Buckeye and Goldgar or to bar the claims because these plaintiffs can show no evidentiary basis admissible at trial to support the claims.

The parties agreed to and filed the following stipulated facts. In the fall of 1973, Mike Goldgar, a real estate developer, proposed to construct an office building, Buckeye Tower II, in the vicinity of Atlanta, Georgia, at an estimated cost of $1,850,000. Goldgar and M. G. Buckeye Corp., a corporation formed by Goldgar, sought to obtain financing of the project in the fall of 1973. Goldgar and Buckeye forwarded a proposal for a permanent loan commitment to Aetna, a New York Corporation whose principal place of business is in East Hartford, Connecticut. On or about October 17, 1973, Aetna responded by forwarding a loan application which set forth the terms and conditions under which Aetna would issue a permanent commitment. Buckeye executed the application for permanent commitment and returned it to Aetna which

then issued a permanent commitment to Buckeye on November 9, 1973. The permanent commitment, which was to remain in effect until August 1, 1975, was for an amount of $1,850,000, to be repaid over a ten year term with monthly interest payments at the rate of 4.5% above the prime rate.

Mellon Bank, N. A., a national banking association whose principal place of business is in Pittsburgh, Pennsylvania, agreed to become the interim lender in December 1973, and issued a construction loan which was secured by mortgage on the property and the building under construction and was personally guaranteed by Goldgar. Mellon, Aetna, and Buckeye signed a "Buy–Sell Agreement" in January 1974. The requirements for Aetna's obligation to assume or fund the loan, in effect replacing Mellon as Buckeye's creditor, are principally set out in this document.

The construction loan agreement provided for a fixed contract cost for the erection of a building of $1,350,000 maximum, with the difference between that sum and $1,850,000 representing the cost of the land, fees and other expenses as well as the interest on the loan. Interest was pegged to Mellon's prime rate and was deducted monthly from the amount of the loan proceeds remaining to be disbursed. By the late fall of 1974, Mellon officials realized that the remaining undisbursed funds would not suffice to complete the building and in December, 1974, suspended payments to Buckeye's contractor. Because the contractor was not paid, construction stopped and the contractor and others filed liens against the premises. Default in the payment of interest also occurred. On February 5, 1975, Mellon notified Buckeye that it was declaring the construction loan in default and demanding payment in full of both principal and interest from both Buckeye and Goldgar, guarantors of the note.

To cure these defaults and resume construction, Mellon agreed by contract dated March 14, 1975, to advance another $305,000 to Buckeye which was to be secured by a second mortgage on the premises, a pledge

of all Buckeye's outstanding stock, and an assignment of all cash receipts. Mellon made a further loan to Buckeye of $20,000 through an agreement dated July 21, 1975. Through the stock pledge Mellon acquired full voting rights and control of Buckeye's Board of Directors and management. Richard M. Maier, a Mellon vice–president, became President of Buckeye and a director, and other Mellon employees assumed management positions which they held until January, 1976. The March 14th agreement expressly pronounced that the default in the payment of interest on the building was cured by the infusion of these funds and reinstated the building loan.

After communications between Aetna and Mellon concerning the "Buy–Sell Agreement", Aetna informed Mellon that the loan would not be funded because the terms and conditions of the agreement could not be met by August 1, 1975. On July 25, 1975, Mellon forwarded certain documents to Aetna and proposed to transfer the loan to Aetna on August 1, 1975. Aetna rejected tender by letter dated July 30, 1975. On September 2, 1975, Mellon sold the property at a foreclosure sale to a wholly–owned subsidiary for $940,000 as approved by a Georgia court order, McGanney Affidavit, Exhibit T.

After denying cross motions for Summary Judgment in the opinion of March 30, 1979, this Court issued a pretrial order dated August 2, 1979. Pursuant thereto on August 16, 1979, Buckeye and Goldgar advised this Court that they intended to strike from their witness list, Johns–Manville Corp., Andrew McColgun Company and Richard Lawrence. On September 19, 1979, Buckeye and Goldgar filed their supplemental pretrial statement of Classification of Amount of Damages as ordered. No expert witness report concerning the value of Buckeye Tower II has been filed by Buckeye and Goldgar.

On October 19, 1979, Aetna moved for summary judgment against Buckeye and Goldgar asserting: (1) Pennsylvania law is applicable; (2) Buckeye and Goldgar are barred by Local Rules of this Court from introducing expert testimony concerning the value of Buckeye Tower II; (3) Buckeye

and Goldgar cannot as a matter of law recover any of the damages specified; and (4) there is no genuine issue of material fact and Aetna is entitled to judgment as a matter of law against Buckeye and Goldgar.

I.

PENNSYLVANIA CONFLICT OF LAWS RULES DEMAND THE APPLICATION OF PENNSYLVANIA LAW IN DECIDING THIS CASE.

Ordinarily the Court does not consider the question of choice of law in a diversity case unless a contention is raised that the law of some other jurisdiction which may be applicable to the case before it differs from the substantive law of the forum state. No such presentation has been made here except that Aetna contends that the substantive law of Pennsylvania shall govern and Buckeye and Goldgar argue that "common law of English speaking jurisdictions in general" should apply. We do not readily understand this statement so we will approach the matter under the choice of law rules of the forum state in which this District Court sits. *Klaxon v. Stentor Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

The conflict of laws rules of Pennsylvania reveal that the "modern approach" as set forth in the RESTATEMENT (Second) of Conflict of Laws was applied in a tort liability case. *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964). This "center of gravity" approach was also utilized in a contractual setting in *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205 (3d Cir. 1970), where an analysis of all factors surrounding the controversy were considered and the court ruled that Pennsylvania had the greatest interest in applying its law.

Restatement (Second) of Conflict of Laws §§ 186–188 provide a guideline for determining which state's "local laws" apply in considering diversity jurisdiction suits. Because there appears to be no consensus by the parties as to which state's laws to apply, § 188 is helpful in weighing the contacts to determine applicable law in accordance

with Pennsylvania procedure. Five factors are suggested in the determination of applicable law: (1) place of contracting; (2) place of negotiation; (3) place of performance; (4) location of subject matter; and (5) residence or place of incorporation or the place of business of the parties.

The contract in controversy is a "Buy–Sell Agreement" concerning a piece of property located in the state of Georgia. Because that piece of property was sold to satisfy the construction loan contract, and because the sale was judicially condoned by a DeKalb County Court, that property is no longer within the control of any of the parties to this controversy. Georgia's interests, as derived from the location of the subject matter, have been removed.

Because we are dealing with three corporations located in three different states, none of those three interested states derive a greater interest than the others based solely on the major place of business.

Three factors remain, however, which favor application of Pennsylvania law. The major place of negotiation and the place of contracting of the "Buy–Sell Agreement" appears to have been in the office of Mellon in Pittsburgh, Pennsylvania, and the unperformed part of the agreement is the purchase of the first mortgage by Aetna.[1] An application of the Pennsylvania conflict of laws rules indicates that the interests of Pennsylvania local law is greater than any other state involved in this controversy and, consequently, Pennsylvania law should be applied.

## II.

LOCAL RULE 5(II)D.2.(b) PRECLUDES TESTIMONY BY ANY EXPERT WITNESS FOR WHOM REPORTS WERE NOT FILED IN ACCORDANCE WITH THIS COURT'S ORDER OF AUGUST 2, 1979.

 The Pretrial Narrative Statement of Plaintiffs Buckeye and Goldgar listed prospective witnesses including Johns–Manville Corporation, Andrew McColgan Company, and Richard Lawrence. Defendant Aetna

objected to Johns–Manville and Andrew McColgan Company because individual witnesses from these companies were not specified. Aetna further objected to testimony by Richard Lawrence because he was not identified and, if he were a proposed expert witness, no expert witness report had been filed. Fed.R.Civ.P. 26 permits limiting the scope of discovery by court order. Rule 26(b)(4)(A)(i) states:

A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary for the grounds for each opinion.

Consequently, this Court's pretrial order of August 2, 1979 directed the plaintiffs to identify proposed witnesses and to file supplemental pretrial reports of any expert witness whose testimony will be offered at trial. Proposed witnesses Johns–Manville Corporation, Andrew McColgan Company, and Richard Lawrence were stricken by plaintiffs Buckeye and Goldgar by letter dated August 16, 1979, and no expert witness report has been filed. Local Rule 5(II)D.2.(b) states:

If timely production of any such report is not made, the testimony of such expert shall be excluded at the trial, except upon consent of the other party or parties, or order of court.

Although Local Rule 5(II)D.2.(b) provides exceptions to disclosure of testimony, no grounds for exception have been submitted to this Court. Consequently, expert testimony not submitted as ordered by this Court on August 2, 1979, will be precluded from presentation at trial.

## III.

BUCKEYE'S EXPECTATION CLAIM IS BASED ON BARE SPECULATION AND WILL NOT BE PERMITTED.

Plaintiff's Statement of Classification and Amount of Damages of September 19,

---

1. This Court has already ruled that plaintiffs were able to properly tender as a matter of law.

1979, sets forth the damage claims which Buckeye and Goldgar are asserting for the alleged breach of contract by Aetna. Claims 1, 2, and 3 are alternative claims asserted by Buckeye only and are in the form of expectation, reliance and restitution. Claims 4 and 5 of the Statement assert claims made by both Buckeye and Goldgar.

■ The first question which arises is as to whether claims for damages and restitution can be pleaded in the alternative. Corbin, Contracts, Vol. 5 § 1078 (1964 ed.) states, "It is not improper for plaintiff to bring his action by a complaint containing alternative counts for damages and restitution; but it would be error to allow the jury to bring in a verdict for the plaintiff on both counts." Pennsylvania courts are in accord with the preceding rule, "If there be different modes of measuring damages, depending upon the circumstances, the court should first hear the evidence, and instruct the jury afterward as to the proper measure to be applied." *Bigham v. Wabash–Pittsburg Terminal Rwy. Co.*, 223 Pa. 106, 113, 72 A. 318 (1909); *Rogers v. Bemus*, 69 Pa. 432, 436 (1871).

Claim 1, Buckeye's expectation claim is for the amount of $850,000 which Buckeye claims is the difference between the price for which Buckeye Tower II sold at the 1975 foreclosure sale and the value which the building would have had had Aetna not defaulted. Buckeye claims to have made allowance for the fact that Aetna's loan would have required repayment. We first note that Buckeye claims no damages for lost profits and that this expectation claim is merely for a difference in value of the building itself.

■ According to Pennsylvania law, special damages are recoverable for breach of contract provided those damages fit within the following guidelines.

> Where one party to a contract, without any legal justification, breaches the con-

tract, the other party is entitled to recover, unless the contract provides otherwise, whatever damages be suffered, provided (1) they were such as would naturally and ordinarily result from the breach; or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty. *Taylor v. Kaufhold*, 368 Pa. 538, 546, 84 A.2d 347 (1951)

See also, *Universal Computer Systems, Inc. v. Medical Services Association of Pennsylvania*, 474 F.Supp. 472, 479 (M.D.Pa.1979); Restatement of Contracts §§ 330, 331.

A DeKalb County Georgia court found that the fair market value of Buckeye Tower II at the time of the foreclosure sale was the $940,000 price for which it sold. This finding is supported by Exhibit 1 of Mellon's Supplemental Pretrial Narrative dated August 31, 1979. Laudauer Associates, an Atlanta real estate consultant firm, appraised Buckeye Tower II on October 1, 1975, and certified that the fair market value of the fee simple was $940,000.

■ Although Buckeye claims that the fee simple was worth considerably more than the fair market value as found by both the DeKalb County court and Laudauer Associates, nothing more than an unsupported allegation has been asserted. Furthermore, Buckeye intends to present no expert testimony to contradict the finding of fair market value and, as discussed supra, it is barred from presenting any such testimony by Local Rule 5(II)D.2.(b). We can conceive of no manner in which Buckeye can prove its expectation claim with reasonable certainty as required. In regard to fair market value of Buckeye Tower II, the finding by the DeKalb County court and the appraisal of Laudauer Associates will stand. Because we can find no genuine issue of material fact, Buckeye's expectation claim (Claim 1) will not be permitted.

## IV.

### AETNA HAS NOT MET ITS BURDEN OF PROVING THAT THERE ARE NO SUBSTANTIAL ISSUES OF MATERIAL FACT CONCERNING BUCKEYE'S CLAIMS FOR RELIANCE DAMAGES AND THE CURRENT STATE OF THE RECORD DOES NOT PERMIT SUMMARY JUDGMENT AGAINST BUCKEYE IN REGARD TO BUCKEYE'S FIRST 2 ITEMS OF RELIANCE DAMAGES.

■ Buckeye claims three items of reliance damages in Claim 2 of its Statement: (1) damages of $325,000 which represents money spent by Buckeye in preparing the building to meet the specifications of the "Buy–Sell Agreement"; (2) damages of $217,500 which represents the value of time and effort spent by Buckeye and its agents in completing the construction; and (3) damages of $161,500 which represents non-monetary contributions for which Buckeye has not been compensated. The moving party in a motion for summary judgment under Fed.R.Civ.P. 56 has the burden of showing the absence of any genuine issue of material fact. This is a strict standard which must clearly exclude all doubt and if any doubt exists, the court must find in favor of the party adverse to the motion. Moore's Federal Practice Vol. 6 § 56.15(3) (2d ed. 1976). As set forth below this court does not feel that Aetna has met its burden in regard to Buckeye's first two reliance claims.

### A.

### AETNA HAS NOT MET ITS BURDEN IN REGARD TO BUCKEYE'S RELIANCE CLAIM FOR $325,000.

The first reliance claim is for the amount of $325,000 which represents the second mortgage given in return for additional loans to enable Buckeye to meet the specifications required by the "Buy–Sell Agreement". This court has already found that a debt limitation of $1,850,000 was not a condition precedent to Aetna's performance under the "Buy–Sell Agreement", that the failure of Aetna to perform would have a "cataclysmic effect on the outcome of the whole transaction", that cost overruns in construction contracts are common, and that the parties should have reasonably anticipated such cost increases. *Mellon*, supra at 662. Aetna contends that this additional loan, together with the other reliance claims, was a noncompensable, pre–development cost made prior to the agreement. This has no apparent basis as the Stipulated Facts clearly show that the permanent commitment was issued by Aetna to Buckeye on November 9, 1973; that the "Buy–Sell Agreement" was executed in January, 1974; and that the additional loans totalling $325,000 were advanced on March 14, 1975, and in June 1975. The additional loans of $325,000 clearly cannot be classified as pre–development costs made prior to the agreement.

■ Aetna further contends that had Aetna performed under the "Buy–Sell Agreement", Aetna would have been forced to foreclose the loan instead of Mellon. The basic concern in awarding damages is to assure that innocent parties are not harmed as a result of a breach of contract.

Generally speaking, the measure of damages applicable in a case of breach of contract is that the aggrieved party should be placed as nearly as possible in the same position as he would have occupied had there been no breach. In other words, he is entitled to be reimbursed for the money actually paid out and for all reasonable and proper expenses incurred on the face of the contract. *Harman et ux v. Chambers*, 358 Pa. 516, 520–522, 57 A.2d 842 (1948).

See also: Corbin, Contracts, Vol. 5 § 992; Restatement of Contracts § 329. Aetna contends that because Buckeye had no funds other than the money loaned to it by Mellon, Buckeye incurred no compensable losses. But Buckeye did become indebted an additional $325,000 due to an increase in construction costs which this Court had already found to be a common situation in construction contracts. The issue of whether the actions of Mellon and Buckeye in negotiating the additional loans were done in reliance of Aetna's performance under

the terms of the "Buy–Sell Agreement", had not been adequately settled by Aetna's pleadings to this court. We are not now deciding whether the additional loans were consummated in reliance upon Aetna's performance nor are we deciding to whom damages should be paid should liability be found, but solely find that Aetna has not satisfied its burden of proof of eliminating any issues of material fact by proving that this was not "a reasonable and proper expense incurred on the face of the contract." *Harman*, supra.

### B.

### AETNA HAS NOT MET ITS BURDEN IN REGARD TO BUCKEYE'S RELIANCE CLAIM FOR THE REASONABLE VALUE OF WORK AND LABOR.

Buckeye's second claim for reliance is for the sum of $217,500 which Buckeye asserts is the reasonable value of the time and effort spent by Buckeye and its agents in completing the construction. Aetna claims that Buckeye admits that there were no expenses incurred by it which were not properly reimbursed by the construction loan and, consequently, only Mellon would be entitled to receive any damages found under this claim. We note that proper consideration was given by Buckeye to Mellon in return for the loans, and we are not satisfied that only Mellon sustained a tangible, reimbursable loss. Corbin, Contracts Vol. 5 § 1032 states:

> If the injured party has, in the course of performance or in preparation therefor, transferred or consumed property or has performed work and labor of value, these may be estimated and included along with his cash outgo.

(See Corbin, Contracts Vol. 5 § 1031 concerning recovery for expenditures.) There still remains open an issue of fact whether Buckeye has performed work and labor of value which can be included as an item of damage.

Restatement of Contracts § 343 which deals specifically with damages for breach of a contract to loan money states:

> Damages for breach of a contract to lend money are measured by the cost of obtaining the use of money during the period of credit, less interest at the rate provided in the contract, plus compensation for other unavoidable harm that the defendant had reason to foresee when the contract was made.

This further supports Buckeye's claims for reliance for both the additional loans and the value of work and labor. It is reasonably foreseeable that increases in construction costs will occur, *Mellon*, supra at 662, and it is also reasonably foreseeable that valuable work and labor will be performed in reliance of an agreement to loan money.

Once again, Aetna has not met its burden of removing all factual issues and we must deny summary judgment on this issue. Moore's § 56.15(3).

### C.

### AETNA HAS MET ITS BURDEN IN REGARD TO BUCKEYE'S RELIANCE CLAIM FOR NON–MONETARY CONTRIBUTION ITEMS AND THIS CLAIM WILL BE DISMISSED.

■ Buckeye's third reliance claim is for non–monetary contribution "for the value of assets and expenses for which no payment or insufficient payment was made such as architectural loans." We are not sure exactly what Buckeye is claiming as non–monetary contribution items but according to answers to interrogatories as sworn to by officials of Buckeye, there were no expenditures that were not charged against the construction loan. We specifically find no basis other than pure speculation to support Buckeye's claim that the architectural plans were worth more than $100,000 especially in light of Exhibit A to Aetna's reply memorandum of January 20, 1980, which specifically shows a payment of $24,600 for "Architect–Engineer Fees." In light of the evidence presented in these answers to Aetna's interrogatories, we agree with Aetna that the burden has shifted to Buckeye to prove that these non–monetary contributions have a value above and beyond the apparent value as presented in

evidence. Buckeye and Goldgar have failed to show that they can produce any evidence competent to raise an issue of fact as to this claim.

> To defeat a movant who has otherwise sustained his burden within the principles enunciated above, the party opposing the motion must present facts in proper form–conclusions of law will not suffice. And the opposing party's facts must be material and of substantial nature.

Moore's, supra § 56.15(3). We feel that Aetna has met its burden of proof in regard to the reliance claim of $161,500 for non-monetary contributions, and this claim will be barred.

We therefore find that substantial issues of material fact still exist in regard to the two items of reliance claims involving the additional loans by Mellon to Aetna and to the value of any labor or work done by Buckeye in reliance of Aetna's performance under the "Buy–Sell Agreement." The burden of proving such reliance damages falls upon Buckeye at the trial of this matter. No evidence will be permitted in support of the third item of Claim 2.

## V.

### AETNA HAS NOT MET ITS BURDEN OF PROVING THAT THERE ARE NO SUBSTANTIAL ISSUES OF MATERIAL FACT CONCERNING BUCKEYE'S CLAIMS FOR RESTITUTION DAMAGES AND BUCKEYE'S ALTERNATE CLAIM OF RESTITUTION WILL BE PERMITTED.

Claim 3 of Buckeye's statement, which it pleads in the alternative with the expectation and reliance claims, is for restitution in the amount of $86,500 which is the amount paid by Buckeye to Aetna for obtaining the loan commitment. Aetna merely contends that because this expenditure was paid for by the construction loan, any restitution paid in damages would be to Mellon and not Buckeye. This is an issue of material fact which, once again, cannot be decided by this court on a motion for summary judgment. Aetna has not met its burden and the alternate claim of restitution will stand.

## VI.

### PENNSYLVANIA PERMITS THE AWARD OF NOMINAL DAMAGES AND COSTS FOR BREACH OF CONTRACT WHERE NO ACTUAL HARM IS SHOWN, HOWEVER, COUNSEL FEES ARE NOT AWARDED.

■ Goldgar and Buckeye claim in Claim 4 of their statement dated September 19, 1979, "Nominal damages to the credit of Buckeye and Goldgar". Nominal damages are awarded where liability can be shown for a breach of duty or for a breach of contract, however, the maximum award for nominal damages recoverable in Pennsylvania is one dollar. *Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 455, 197 A.2d 721 (1964). The majority of cases indicate that nominal damages will be awarded any time a breach of contract is shown. *Rineer v. Collins*, 156 Pa. 342, 27 A. 28 (1893); *Fessler v. Love*, 48 Pa. 407 (1864); *Adams Express Co. v. Egbert*, 36 Pa. 360 (1860). Consequently, if evidence proves that Aetna breached a contract with either Goldgar or Buckeye, those parties can recover nominal damages. Williston, Contracts, Vol. 5 § 1345 (Revised Edition) at 3776 states:

> Though any breach of contract entitles the injured party at least to nominal damages, he cannot recover more without establishing a basis for an inference of fact that he has been actually damaged.... But though there must be evidence of substantial damage in order to justify recovery of more than a nominal sum, the exact amount need not be shown. Where substantial damage has been suffered, the impossibility of proving its precise limits is no reason for denying substantial damages altogether.

■ Goldgar and Buckeye claim in Item 4 that the "substantial damages" which resulted have occurred due to loss of credit as a direct result of Aetna's breach. The law in Pennsylvania as to loss of credit is that "[L]oss of credit standing alone, is not proof of damage, unless the loss of credit connects itself with some tangible pecuniary loss of which the loss of credit was the cause."

*Johnson v. Four States Enterprises, Inc.,* 355 F.Supp. 1312, 1218 (E.D.Pa.1972), aff'd 495 F.2d 1386 (3d Cir. 1974); *Smith v. Western Union Telegraph Co.,* 150 Pa. 561, 564, 24 A. 1049 (1892); *Eckel v. Murphy,* 15 Pa. 488, 495 (1850); *Altoona Clay Products Co. v. Dun & Bradstreet, Inc.,* 286 F.Supp. 899, 904 (W.D.Pa.1968). To collect damages other than nominal due to a loss of credit, plaintiffs will have to prove a "tangible pecuniary loss" which has directly resulted from a loss of credit attributable to Aetna's breach of contract. This, plaintiffs Buckeye and Goldgar concede in their brief dated January 4, 1980, at page 4, they cannot do, "Nevertheless the loss of credit cannot be proved with sufficient specificity to support the award of compensatory damages."

Buckeye, as a party to the "Buy–Sell Agreement" has an apparent cause of action for any breach of contract as a result of Aetna's actions and, consequently, would be entitled to at least nominal damages if liability is proven. As stated in this court's opinion on Cross–Motions for Summary Judgment of March 30, 1979, it is difficult to ascertain any duties which Aetna owed Goldgar as an individual, but the present state of the record does not indicate that Goldgar should be dismissed. *Mellon,* supra, at 669.

■ Should liability be found for plaintiffs Buckeye and Goldgar, they would be awarded costs and a maximum of one dollar as nominal damages. *Elia v. Olszewski,* 368 Pa. 578, 582, 84 A.2d 188 (1951). Furthermore, it is not the practice of the Pennsylvania courts to award counsel fees to an adverse party to a cause. "[I]n the absence of express statutory allowance of the same . . . or some established exception." *Corace v. Balint,* 418 Pa. 262, 271, 210 A.2d 882 (1965); *Fidelity–Philadelphia Trust Co. v. Philadelphia Transportation Co.,* 404 Pa. 541, 548, 173 A.2d 109 (1961); *Hempstead v. Meadville Theological School,* 286 Pa. 493, 134 A. 103 (1926); *Haverstick v. The Erie Gas Co.,* 29 Pa. 254 (1857); *Blum v. William Goldman Theaters,* 164 F.2d 192 (3d Cir. 1947).

Goldgar's claim for attorney's fees, as stated in Item 21 of Plaintiffs' Complaint of April 26, 1976, is not supported by Pennsylvania law and will be stricken.

## VII.

### PENNSYLVANIA DOES NOT AWARD PUNITIVE DAMAGES FOR BAD FAITH OR MALICIOUS BREACH OF CONTRACT.

Claim 5 of plaintiffs' statement dated September 19, 1979, claims, "Exemplary damages in the amount of $3,000,000." The Pennsylvania courts have refused to allow punitive damages for breach of contract. In *Hoy v. Gronoble,* 34 Pa. 9, 11–12 (1859), the court held that it was error to allow vindictive (punitive) damages for "violation of faith" in a contract case other than the single exception of breach of promise of marriage. Because "all breaches of contracts necessarily involve violation of faith," this would be duplicate damages. The Pennsylvania Supreme Court further decided in *Pittsburgh C. & St. L. Railway Co. v. James A. Lyon,* 123 Pa. 140, 150, 16 A. 607 (1888), that the motive for breaching a contract is not important and that the recovery would be restricted to the damages caused by the breach itself. "(T)he measure being the same whether the defendant fails to comply with his contract through inability, or willfully refuses to perform it."

Plaintiffs rely on a case in which the jury was instructed that punitive damages would be recoverable although none was actually awarded. The Supreme Court of Pennsylvania permitted the instruction in *Patterson v. Marine Bank,* 130 Pa. 419, 432–434, 18 A. 632 (1889), based upon public policy which would not permit a bank to refuse to honor a check of one of its depositors. "There is something more than a breach of contract in such cases; there is a question of public policy involved." *Patterson* has been exclusively restricted to the facts in that case. See, *Smith v. Western Union Telegraph Co.,* 150 Pa. 561, 24 A. 1049 (1892), in which a telegraph company refused to pay the check to a customer to whom the money was sent and *Franklin Trust Co. of Philadelphia,* 319 Pa. 367, 372,

179 A. 592 (1935), in which an insolvent bank set off deposits in a trust fund against the debt due by a depositor individually.

Plaintiffs also cite *Funk v. Kerbaugh*, 222 Pa. 18, 70 A. 953 (1908), as a basis for awarding punitive damages. *Funk* was an action in trespass to recover damages for "injuries to property real and personal." Punitive damages were awarded due to defendant's willful, reckless and negligent handling of dynamite during construction procedures. The punitive damages were awarded on the theory of tort and there appears to be no connection between *Funk* and the case at bar.

■■■ Punitive damages are awarded in a breach of contract action based upon the tort of intentional interference with business. This tort, however, requires a third party's interference which forces the breaking of a contract between two parties. The standard is "malice, vindictiveness, and wanton disregard" of another's rights and, "It encompasses that kind of conduct which is so wholly reckless of another's rights as to call for a monetary relief." *Richette v. Pennsylvania R. R.*, 410 Pa. 6, 16–17, 187 A.2d 910 (1963). A mere breach of contract which has the effect of damaging plaintiff's business relations with others does not support the tort of intentional interference with business.

> However, where, as in this case, the allegations and evidence only disclose that the *defendant breached his contract with the plaintiff* and as an incidental consequence thereof plaintiff's business relationships with third parties have been affected, an action lies only in contract for defendant's breaches, and the consequential damages recoverable, if any, may be adjudicated only in that action.... Most courts have been cautious about permitting tort recovery for contractual breaches and we are in full accord with this policy. *Glazer v. Chandler*, 414 Pa. 304, 308, 200 A.2d 416 (1964).

The Pennsylvania courts have not changed their policies regarding punitive damages as set forth in *Glazer*. District Judge Luongo recently ruled in *Iron Mountain Sec. Storage v. American Specialty Foods*, 457 F.Supp. 1158, 1165–1166 (E.D.Pa. 1978) that caution must be used in deciding whether a counterclaim which asserted a tort claim for compensatory and punitive damages based upon "bad faith or malicious breach of contract" should be accepted. "Although the theory proposed by defendants is not totally without basis ... I conclude that it would not be accepted by the Pennsylvania courts in the facts presented in this case." Judge Luongo relied heavily on *Becker v. Interstate Properties*, 569 F.2d 1203, 1204 (3d Cir. 1977):

> The task of a federal court sitting in diversity is frequently not an easy one, for it must forsake its realm of expertise and assume the aspect of a court of the forum state. Even when applying well–settled law, the federal tribunal must be alert to nuances of precedent. Where ... a federal court is asked to pass on the implication of a declaration by a state high court of a new principle in an evolving area of the law, it must act with even greater sensitivity.

■■■ There is no basis in Pennsylvania law for awarding punitive damages for breach of contract other than as a matter of public policy as set forth in *Patterson*. There is no apparent matter of public policy in the case at bar. And because the Pennsylvania courts have not recognized "bad faith and malicious breach of contract" as a basis of punitive damages, neither Goldgar nor Buckeye can recover punitive damages.

## VIII.

## THE CURRENT STATE OF THE RECORD DOES NOT PERMIT THE AWARDING OF SUMMARY JUDGMENT BECAUSE OF UNRESOLVED ISSUES OF MATERIAL FACT.

This court does not believe that the unresolved issues of material facts addressed in the Opinion on Cross–Motions for Summary Judgment of March 30, 1979, have been resolved. Once again, these issues may be better considered on a motion for directed verdict after full presentation of the plaintiffs' case. Accordingly, the motion of Aetna for summary judgment is denied, but the

rulings made herein and in the order issued herewith shall govern the trial of the action in accordance with Fed.R.Civ.P. 56(d).