MELLON BANK, N.A., M. G. Buckeye Corp., and Mike Goldgar, Plaintiffs,

v.

BARCLAYS AMERICAN/BUSINESS CREDIT, INC., Defendant.

MELLON BANK, N.A., Plaintiff,

v.

M. G. BUCKEYE CORP.

Civ. A. Nos. 75–1135, 81–1285.

United States District Court,
W. D. Pennsylvania.

Dec. 2, 1981.

Thomas R. Johnson, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for Mellon Bank, N.A.

David Ries, Thorp, Reed & Armstrong, Pittsburgh, Pa., for Barclays American/Business Credit, Inc.

James Joseph, Pittsburgh, Pa., for M. G. Buckeye Corp.

## OPINION

WEBER, Chief Judge.

The above cases are presently before the court on motions for judgment on the pleadings and a motion to dismiss counterclaim filed by plaintiff, Mellon Bank, N.A. against defendant, M. G. Buckeye Corp. We are not wholly unfamiliar with this matter. This action has been in litigation before us for several years and has twice been the subject of opinions by this court. See *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 500 F.Supp. 1312 (W.D.Pa. 1980); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 468 F.Supp. 656 (W.D.Pa.1979). Accordingly we are fully familiar with the facts surrounding the business dealings of the parties in these actions. Briefly summarized those facts are as follows:

In the fall of 1973 Mike Goldgar, a real estate developer, and M. G. Buckeye Corp., a corporation formed by Goldgar, began to make plans for the construction of a large office complex near Atlanta, Georgia. This project, called Buckeye Tower II, was to be built at an estimated cost of $1,850,000. As part of their financing of the project Goldgar and Buckeye applied to Aetna Business Credit, Inc.[1] for a permanent loan commitment. In November of 1973 Aetna agreed to provide a permanent loan commitment for this project. Under the terms of this permanent commitment, upon satisfactory completion of the building, Aetna would provide Buckeye $1,850,000 to pay off all construction loans.

Armed with this permanent commitment from Aetna, Goldgar and Buckeye sought out interim construction financing. In December of 1973, Mellon Bank N.A. agreed to become the interim lender for the project. The construction loan agreement between Mellon and Buckeye provided for a fixed contract cost for the erection of the building of $1,350,000, with the difference between that sum and the $1,850,000 representing the cost of land, fees and other expenses as well as interest on the loan. The loan agreement also provided that the unpaid balance of the loan would become due and payable to Mellon on August 1, 1975. This loan was secured by a mortgage on the property and building under construction and was personally guaranteed by Goldgar.

---

1. Aetna has subsequently been purchased by Barclays American/Business Credit, Inc. and Barclays has been substituted for Aetna in the caption of this matter. However, for the sake of consistency, and out of force of habit, we will continue to refer to the defendant as Aetna in this opinion.

In January of 1974, Goldgar, Mellon, Aetna and Buckeye executed a "Buy-Sell Agreement". Under the terms of this agreement Aetna was obliged to assume or fund the construction loan by August 1, 1975; in effect, replacing Mellon as Buckeye's creditor.

Construction on the project began in the spring of 1974. By the fall of 1974, however, Mellon officials recognized that the remaining undisbursed funds would be insufficient to complete construction. Accordingly, in December 1974, Mellon suspended payments to Buckeye's contractor. Because the contractor was not paid, construction stopped and the contractor and others filed liens against the premises. Buckeye also defaulted on its interest payments under the construction loan agreement.

On February 5, 1975, Mellon notified Buckeye that it was declaring the construction loan in default and demanded payment in full of both the principal and interest on that loan.

Buckeye and Goldgar, however, succeeded in curing this default. By a note dated March 14, 1975, Mellon agreed to advance an additional $305,000 to Buckeye in order to allow Buckeye to resume construction on this project. Under the terms of this agreement Mellon's loan was secured by a second mortgage on the premises, a pledge of all of Buckeye's outstanding stock and an assignment of all cash receipts. This second agreement also provided that the unpaid balance of the loan was due and payable to Mellon on August 1, 1975. Moreover the March 14, 1975 loan agreement expressly pronounced that the default in the payment of interest on the first loan was cured by this additional loan. See, *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 500 F.Supp. 1312, 1314 (W.D.Pa.1980). In addition the agreement provided that the first loan would be reinstated by this second loan.

On July 21, 1975, Mellon made a third loan to Buckeye in the amount of $20,000. As was the case with the prior two loans, payment of the balance due on this note was to be made on August 1, 1975.

On July 25, 1975, Mellon forwarded certain documents to Aetna along with a proposal that Aetna assume the loan on August 1, 1975. Aetna rejected the tender of this loan by letter dated July 30, 1975. In fact no transfer ever occurred. On September 2, 1975, Mellon sold the Buckeye Tower property at a foreclosure sale for $940,000.

On September 10, 1975, Mellon commenced an action against Aetna in the United States District Court for the Western District of Pennsylvania. In this action Mellon sought to recover from Aetna the damages it incurred as a result of Aetna's refusal to assume the construction loans on the Buckeye Tower II project. Buckeye and Goldgar joined in this action against Aetna.

On July 31, 1981, Mellon filed a motion to amend its complaint in this action. In this amendment Mellon sought to assert a cross claim against M. G. Buckeye Corp. In addition, on July 31, 1981, Mellon filed a separate civil action against Buckeye.

Review of the complaint filed in this new civil action and of the amended complaint in the original action reveal that they are substantially the same. In both Mellon alleges that Buckeye has defaulted on the three construction loans made by Mellon on the Buckeye Tower projects. As a result of these defaults Mellon claims damages in the amount of $1,235,000 plus interest, and attorneys' fees on the amount of ten percent of the unpaid balance of the loans.

In its answers in both actions Buckeye admits that it is in default on these notes in the amount of $1,235,000. The defendant asserts, however, that Mellon's claims are barred under the statute of limitations. The defendant has also filed a counterclaim with its answers and has moved to amend its complaint to assert a cross claim against Mellon. In these pleadings Buckeye demands that it be subrogated to any claims that Mellon possesses against Aetna. Mellon has responded by filing motions for judgment on the pleadings and a motion to dismiss Buckeye's counterclaim. These mo-

tions have been fully briefed and are now ripe for our resolution.

In our view, these motions present two distinct legal issues. First, is Mellon Bank's claim for damages barred by the statute of limitations? Second, does M. G. Buckeye have any right to be subrogated to the claims of Mellon against Aetna?

In this case we do not believe that the statute of limitations bars Mellon Bank from recovering the amounts admittedly owed it by M. G. Buckeye Corp. Nor do we believe that M. G. Buckeye has any right to be subrogated to claims of Mellon against Aetna. Therefore, we would grant Mellon Bank's motions for judgment on the pleadings and its motion to dismiss the counterclaim of M. G. Buckeye.

## I.

█ In its answers to Mellon Bank's complaints Buckeye asserts that "the claim set forth in the complaint did not accrue within the six years next preceding the commencement of this action." Therefore, according to Buckeye, these claims are now barred under Georgia's six year statute of limitation governing written contracts. 3 Ga. Code § 705.[2]

At the outset we recognize that this argument is totally inapplicable to the last two notes entered into by Mellon and Buckeye. These notes, dated March 14, 1975 and July 21, 1975, expressly provide that the balance due and owing to Mellon becomes payable on August 1, 1975. Thus the earliest date on which Buckeye could have defaulted on these notes was August 1, 1975. This being the case no cause of action on these notes could have accrued to Mellon Bank until August 1, 1975.

In this case Mellon brought this action against Buckeye on July 31, 1981. Clearly, then, with respect to the last two notes this action is timely filed.

█ Defendant Buckeye argues, however, that Mellon's claim on the initial construction note is now time barred. Simply

stated Buckeye's argument with respect to this first loan is that Mellon's cause of action accrued on February 5, 1975, the date that Mellon declared that note in default because of Buckeye's failure to make the interest payments required under the contract.

We reject this argument. Admittedly a default on this first note was declared by Mellon on February 5, 1975. That default was subsequently cured, however, by an agreement between Mellon and Buckeye, dated March 14, 1975. Under the terms of this agreement, Mellon advanced additional funds to Buckeye in return for a second mortgage on Buckeye Towers II, a pledge of all outstanding Buckeye stock and an assignment of all Buckeye's cash receipts. The express purpose of this March 14th agreement was to allow Buckeye to cure its defaults and resume construction. Moreover, the agreement itself provided that the first loan was reinstated by this second agreement. In fact, Buckeye did use these funds to cure its defaults on the first construction loan. Furthermore, no additional defaults occurred on this contract until August 1, 1975.

Given these facts we feel that the March 14th agreement constituted an acknowledgement and partial payment by Buckeye of its liability under the first note. Under Georgia law such a written acknowledgement, coupled with partial payment and a new promise to pay, has the effect of renewing the period of the statute of limitations. See 3 Ga.Code §§ 901, 903 and 904. See also, *Cleveland Lumber Co. v. Proctor & Schwartz, Inc.*, 397 F.Supp. 1088 (N.D.Ga. 1975); see generally, 51 Am.Jur.2d, Limitations of Actions, § 360 et seq.

Therefore, in this case Buckeye's obligations on the first note would have been revived by the March 14 agreement. Accordingly the statute of limitations would begin to run on the first note only from the date of the first default following the March 14th agreement. That default oc-

---

**2.** Under the terms of these three notes, Georgia law controls the rights of the parties. There-

fore, this statute of limitations defense will be determined in accordance with Georgia law.

curred on August 1, 1975, when Buckeye failed to pay the outstanding balance due on this note. It follows, then, that the statute of limitations on this first note began to run on August 1, 1975. In this case, the plaintiff's complaint was filed on July 31, 1981, less than six years after Buckeye's default on the first note. Therefore Mellon's claims on that first note are also timely.[3]

## II.

■ Finally, Buckeye, by counterclaim, contends that it should be subrogated to all of Mellon's claims against Aetna. According to Buckeye the parties contemplated that Aetna would be Mellon's principal obligor on this project. Given this characterization of Aetna's role, Buckeye argues that it was merely acting as a surety, insuring payment to Mellon in the event of a default by Aetna. Therefore Buckeye urges that it be subrogated to any and all claims of Mellon against Aetna.

We disagree. The right of subrogation asserted by Buckeye in this case is not founded on contract. Instead it is a creature of equity and, as such, is enforced solely for the purpose of accomplishing the ends of substantial justice. See *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 136, note 12, 83 S.Ct. 232, 235, note 12, 9 L.Ed.2d 190 (1962). Accordingly in this case no absolute right to subrogation exists. Rather, the right to subrogation depends upon the equities attending the individual case. See *Compania Anonima Venezolana de Nav v. A. J. Perez Export Co.*, 303 F.2d 692, 697 (5th Cir. 1962). Moreover in order to prevail the equities of the party seeking subrogation must be superior to those of all other claimants. See *Compania Anonima Venezolana de Nav v. A. J. Perez Export Co.*, supra. In this case Buckeye cannot demonstrate equities superior to those of Mellon Bank. Buckeye's contention that it was acting as a surety in this case fundamental-

ly misconstrues the nature of the relationship between these parties. Admittedly Aetna had agreed to provide a permanent loan commitment on this project. That agreement, however, did not excuse Buckeye from its independent obligations under the construction loans. Quite the contrary, the obligations of Buckeye on these loans are totally separate and distinct from the obligation of Aetna to fund the project. Moreover the terms of Aetna's agreement with Mellon differed markedly from the terms of the Mellon-Buckeye notes. Therefore, Buckeye could be liable on these construction notes even if it was determined that Aetna had no duty to fund the project. Because there is no logical relationship between Buckeye's obligation to Mellon and Aetna's duty to fund the project we cannot accept Buckeye's argument that it had a right of subrogation against Aetna.

Moreover, we feel that allowing Buckeye to be subrogated to Mellon's claims against Aetna would be inconsistent with the prior rulings of this court. By prior opinion and order we limited Buckeye's right to recovery against Aetna to an amount no greater than $543,000. See *Mellon Bank, N.A. v. Aetna Business Credit*, 500 F.Supp. 1312 (W.D.Pa.1980). If we allowed Buckeye to prevail on this counterclaim and assert the right to subrogation against Aetna we would clearly be circumventing this ruling. Having previously determined the limits on Buckeye's right to recovery in this matter, we do not now feel that that right should be expanded by allowing Buckeye to assert a subrogation interest against Aetna.

In this case we can find no reason for permitting Buckeye to assert an equitable right of subrogation to Mellon's claims against Aetna. Therefore, we will order Buckeye's counterclaims dismissed.

■ Finally we note that Mellon Bank has requested as part of its damages attorneys' fees in the amount of ten percent of the unpaid balance on the three notes. The

---

**3.** Because we find that this action was timely filed under Georgia's 6 year statute of limitations, governing written contracts we need not address Plaintiff's argument that the 20 year statute applicable to instruments under seal, see 3 Ga.Code § 703, applies to these three notes.

initial promissory note entered into by the parties merely provided that Buckeye "shall pay all costs of collection, including a reasonable attorney's fee...." The subsequent notes, however, expressly required Buckeye to pay attorneys' fees in the amount of ten percent of the unpaid balance on the note.

It is clear, therefore, that the parties had, by agreement, determined that ten percent of the unpaid balance on the notes constituted a reasonable attorneys' fee. We, therefore, would allow Mellon Bank to recover attorneys' fees in the amount of $123,500 in this case; that amount being ten percent of the unpaid balance owed to Mellon on those three notes.