**In re PENNSYLVANIA FOOTWEAR CORPORATION, Debtor.**

**PENNSYLVANIA FOOTWEAR CORPORATION, Arthur P. Liebersohn, Trustee, Plaintiffs,**

**v.**

**MIDLANTIC BANK, N.A., Defendant.**

**Bankruptcy No. 95–19785DAS.**
**Adversary No. 96–0342DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 14, 1997.

Mark S. Karpo, General Counsel, Philadelphia, PA, Emma L. Oh, Trial Counsel, Philadelphia, PA, for Debtor.

James W. Hennessey, West Conshohocken, PA, for Bank.

Arthur Liebersohn, Former Chapter 7 Trustee, Philadelphia, PA.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before us in the instant bankruptcy case, recently converted from Chapter 7 to Chapter 11, is the disposition of an adversary proceeding ("the Proceeding") instituted by PENNSYLVANIA FOOTWEAR CORPORATION ("the Debtor") against MIDLANTIC BANK, N.A. ("the Bank") seeking monetary damages for breach of an alleged forbearance agreement which caused the Debtor's property, the Maple Plaza Shopping Center, located at 4233 Edgmont Avenue, Brookhaven, Pennsylvania ("the Property"), to be sold to a third party at a February 1992 sheriff's sale ("the February Sale"); and the Bank's motion seeking relief from the automatic stay to foreclose on the Property once again ("the Motion").

Although the February Sale was ultimately set aside, the Debtor alleged, in its initial Complaints in the Proceeding, that it suffered a loss of potential rents of $195,200 and a depreciation of the Property's value of $160,000 as a result of the Bank's action. In a Second Amended Complaint which the Debtor was permitted to file post-trial, it alternatively claimed that a loss of an opportunity to sell the Property in 1992 on account of the sheriff's sale resulted in damages of $330,157.07.

We find, first, that a contract did indeed exist between the Debtor and the Bank, whereby the Bank agreed to remove the Property from the February Sale list, and that the Bank's failure to do so constituted a breach of its contractual duty to the Debtor. Second, in light of the proof of facts supporting the debtor's earlier allegations, we reiterate our previous conclusion that the applicable statute of limitations did not bar the Debtor's claims. Third, we provide support for an order in which we previously allowed the Debtor to amend its Complaint to assert a new theory of damages. Fourth, we believe that each of the measures of the various elements of damages submitted by the Debtor, including the lost opportunity claims, have significant flaws except the claim for attorneys' fees incurred in setting aside the February Sale.

We therefore will effect an equitable measurement of the Debtor's damages, which minimizes adjustments for factors not considered by the Debtor. In so doing, we will also decide the Motion. We will grant the Motion on the conditions that the Bank remit damages of $3,500 on account of the Debtor's reasonable attorneys' fees incurred in setting aside the February Sale and that the Bank waive any deficiency claims against the Debtor's principal or his relatives individually arising from the underlying obligation to the Bank.

### B. FACTUAL AND PROCEDURAL HISTORY

The history of the Proceeding and the underlying bankruptcy case, originally filed *pro se* as a voluntary Chapter 7 bankruptcy case on December 14, 1995, by Joel Karpo ("Joel"), its President and only officer, was related at length in a prior reported decision of August 14, 1996, denying the Bank's motion for summary judgment in its favor in the Proceeding on the basis of limitations, *In re Pennsylvania Footwear Corp.*, 199 B.R. 534 (Bankr.E.D.Pa.1996) ("*Opinion I*"). This recitation, *id.* at 537–40, will be reiterated only where it is necessary to update same and render this Opinion comprehensible. Ironically, it was the Bank's elaborate motion to dismiss this case with prejudice which evoked the defensive pleading, filed on the last possible date to do so, *id.* at 545–46, which was found sufficient to toll limitations pursuant to the applicable Pennsylvania "sav-

ing statute," 42 Pa.C.S. § 5535(a), relative to the Debtor's claims in the Proceeding. *Id.* at 546–51.

As we noted in *Opinion I,* both parties ultimately agreed to a non-jury trial which would be determined by this court. 199 B.R. at 538. That Opinion established September 12, 1996, as the trial date in the event that mediation, which turned out to be unsuccessful, did not result in a settlement. *Id.* at 538, 551.

As noted above, the original Complaint sought $195,200 on account of rents allegedly not collected and $160,000 for depreciation of the Property's value as damages from the Bank in the Proceeding. On July 25, 1996, the Debtor obtained leave from this court to file an amended complaint adding claims for interest, attorney's fees, and liability for subsequent real estate taxes as a result of the Bank's actions. This amended complaint was, however, inexplicably not filed until shortly before trial on September 9, 1996.

The testimony at trial amplified certain aspects of the factual assumptions made in *Opinion I,* 199 B.R. at 538–40, but did not contradict any of them. Extensive testimony was adduced regarding the understandings of the interested parties and their counsel regarding the events surrounding the February Sale. Joel testified that he understood the agreement to mean that he would have six months to sell the Property after the anticipated sale of his other properties at 13 and 15 East Maple Avenue, Brookhaven, Pennsylvania ("the Maple Properties"), to Kahlil Farhat, and that he would pay the net proceeds of the sale of the Maple Properties to the Bank. Joel asserted that this understanding resulted in a second forbearance agreement ("the 2d Forbearance"), and was summarized in a letter dated February 4, 1992, from counsel for the Bank, Anthony D. Reagoso, Esquire, to Joseph Higgins, Esquire, the Debtor's counsel. The letter stated that, "[i]f the shopping center is not sold within six months of the date of the transaction [to sell the Maple Properties] and/or [the Debtor] does not come up with the required amount of cash, the [P]roperty will be sheriff's sold." The Property, however, was not taken off the February Sale list and was sold

to a third party. Joel further testified that the Maple Properties' sale did not take place until September 1993, but that, after it finally did take place, the Debtor remitted the net proceeds of about $45,000 to the Bank. He also indicated that surgery which had resulted in the amputation of his legs caused by his severe diabetic condition was now completed and that consequently he anticipated providing better attention to the Property in the future.

In testimony presented on September 20, 1996, due to his unavailability on September 12, 1996, Reagoso testified that his understanding of the agreement memorialized in the February letter was that, if the Maple Properties sale transaction did not take place before the sale date, the Bank *would* sell the Property at the February Sale. He further testified that the only reason he did not attend the February Sale to represent the Bank's interests was because the sale date was erroneously omitted from his calendar, and not because he was unaware that the sale was going to take place. Reagoso admitted that he indeed did not learn of the sale until March 4, 1992, when he received a phone call from the party who purchased the Property at the sale. That same day, Reagoso informed Higgins of the sale and also prepared a petition to set aside the sale, stating, *inter alia,* that "[t]hrough inadvertence the matter was never taken off the sheriff's sale list." Reagoso stated that the "inadvertence" referred to in the petition was not, however, that the Property was mistakenly left on the sale list, but instead was his failure to attend the February Sale.

Higgins, who appeared hostile to the Debtor and was the subject of an unsuccessful motion of the Debtor to require him to produce portions of his file which he allegedly was withholding, testified that the Bank probably had a right to conduct the February Sale of the Property, because the Maple Properties sale had not taken place by its outside projected date of January 31, 1992. Nevertheless, he stated that he believed that his agreement with Reagoso was that Reagoso, out of professional courtesy, would at a minimum let him know of any intention of the Bank to complete a sheriff's sale of the

Property at a reasonable period of time prior thereto, in order that Higgins could make a last effort to prevent the sheriff's sale. Higgins further testified that he never received prior notice that the Property would be sold on February 21, 1992, and thus believed that the Bank had violated the agreement which he had with Reagoso when he finally learned of the sale from Reagoso on March 4, 1992.

At trial, the Debtor presented testimony from two parties who were interested in purchasing the Property. The first alleged potential buyer was David Cassey, who was looking to expand his optical business, then located in a building directly fronting the Property, and who expressed his interest in buying the Property to Joel in February 1992. Cassey testified that Joel's asking price, over $400,000, was not in his price range. Rather, he stated that he was looking for "a steal" and that, only if the asking price been close to $350,000, would he have engaged an attorney to negotiate further. Cassey also testified that he had not gone so far as making financing arrangements for the purchase when he learned of the February Sale. He testified that he stopped pursuing the Property at that point, because he was concerned about the period of time that it would take to clear up these legal matters. Ultimately, in November 1992, he purchased another property about 100 yards away from the Property and has had no interest in the Property since.

The second alleged potential buyer was Anthony Curcio, who testified on September 20, 1996. Curcio stated that he was very interested in purchasing the Property in early 1992. To that end, in April 1992, he completed and signed an agreement of sale which recited a purchase price of $325,000. Curcio stated he was ready to purchase the Property and pursued it "pretty hard." He appeared to be unaware of or indifferent to the fact that the Property had been sold at the February Sale. In fact, he testified that the February Sale of the Property had not made a difference in his effort to acquire the Property. The agreement of sale was, however, never signed by Joel on behalf of the Debtor for reasons not developed on September 12.

Both parties presented expert testimony regarding the value of the Property. The Defendant called Michael J. McCloskey, a real estate appraiser whom it had hired to appraise the Property on its behalf in the past. McCloskey testified that, by utilizing principally a discounted cash-flow income-based approach, he had valued the Property at $400,000 as of March 31, 1992. In a second appraisal of October 13, 1993, McCloskey concluded that the fair market value of the Property had fallen to $300,000. Finally, he testified that he believed that the Property is presently once again worth $400,-000. Although no formal appraisal or inspection was performed in support of this current evaluation, McCloskey stated that his testimony in this regard was based on the recent sales of other comparable properties on Edgmont Avenue in Brookhaven, resulting in what he termed a "tremendous growth pattern" in the area of the Property.

On September 20, 1996, the Debtor presented expert appraisal testimony from David V. Gilbert, a licensed mortgage broker who estimated that the Property was presently worth but $225,000. Gilbert conceded that he had not done any formal appraisal of the Property and that his valuation estimate had initially been prepared for his son, who is currently interested in purchasing the Property. He believed that the recent sales of other Edgmont Avenue properties was not an important factor because the other properties were much larger parcels, rendering them more desirable.

The parties also presented testimony from one former and two current tenants of the Property with respect to the condition of the Property and their payments of rents. The Bank called Bernard McGovern, a pharmacist who operated a drug store called The Medicine Shoppe in the Property from 1985 through September 1991. McGovern testified that he did not sign a new lease after his initial lease expired in March 1990, but thereafter stayed in the space on a month-to-month basis with an intention of relocating. The reason for his desire to relocate was said to be due to the poor condition of the Property. McGovern testified that there were roof leaks in 1990 and that he witnessed no regu-

lar maintenance done to the Property by the Debtor. He further stated that he repeatedly complained to the Debtor about the conditions, but that no repairs were ever made.

The Bank also presented testimony from a second tenant, Almena Mattero, the present owner of a beauty salon known as "Contemporary Styles by Mena." Mattero testified that she recalled the Property to be in poor condition in 1989 and also in 1992 when she worked at the salon under a previous owner. She said she did not recall any maintenance work being done to the Property by the Debtor during this entire period. Mattero took over the salon in September 1994, and, before doing so, discussed making rent payments of $800 monthly to Joel, but no lease was ever signed. Mattero stated that the Debtor promised to make repairs to the Property, but never did. Mattero thereupon purchased a new heater, an air conditioning unit, and water heater for the space herself, at a total cost of $5,400. She testified that she had paid the Debtor $200 cash per week for approximately six to eight weeks for rent, but then stopped because repairs were never made to her space and a lease was never signed. McCloskey testified that numerous customers of Mattero were present on site when he recently viewed the Property.

The Debtor called Kahil Farhat, the owner of a business at the Property called "Pizza Party." Farhat stated that he has been a tenant at the Property since 1988. He stated that he made monthly rent payments of $1,300 until he received a notice from Reagoso instructing him to hold onto the rent payments because of the ownership dispute. Farhat testified that he still made rent payments to both Reagoso and the Debtor after the February Sale, but that his last payment was made in January 1993. He also testified that when he moved into the space in 1988, there were many problems with the Property, e.g., the roof leaked and one of the two air conditioner units and the heater did not work. Farhat complained to the Debtor, but no repairs were ever made. Farhat stated that he was never questioned about his not paying rent, and that, in lieu of rent, Joel often frequented his restaurant and ate there for free. The court also notes that Farhat's close relationship with Joel appears to have led to his purchase of the Maple Properties, which are adjacent to the Property at issue. Farhat contended that marital disputes had delayed his settlement on the Maple Properties.

The court notes that there appeared to be several significant common themes running through the testimony of each of the three tenant witnesses. The first was that the condition of the Property reflected that it was, at all times since 1985, in disrepair and that the Debtor made no visual efforts to maintain it. The second theme is that it does not appear that the Bank was a significant obstacle to the Debtor's ability to collect rent from the tenants. Rather, collection was limited due to poor maintenance and Joel's failure to pursue the tenants for the rent.

The Property, when fully rented, contained five units, only two of which have been in use for some time. The largest unit, utilized by the Debtor for its former retail shoe business until the mid–1980's, has been vacant ever since. Our efforts to induce the Chapter 7 Trustee, ARTHUR P. LIEBERSOHN, ESQUIRE ("the Trustee"), necessarily originally named as a party plaintiff in the Proceeding, to take control of the Property and at least attempt to collect rents were unsuccessful. Rather, the Trustee took the position that, since the secured claims reported in the Debtor's Schedules[1] indicated no equity in the Property, his efforts would not be worth it.

---

1. The Schedules list the following secured claims: The Bank, $222,054.46; Herb Cantor, $48,811.72 for a loan to the Debtor in April 1992 to pay real estate taxes; $49,256.03 in present delinquent County real estate taxes; $12,019.14 in delinquent borough real estate taxes; and $4,721.81 in past-due corporate income taxes, a total of $336,863.16. Also listed as a priority claim is an $80,000 loan from Harry Karpowitz in April 1992. No general unsecured creditors are listed, although Higgins, for one, would seem to fall into this category. The Trustee apparently concluded that the listed secured and priority claims exceeded the highest value estimate of $400,000 and that, even if he realized proceeds from a sale, there were no unsecured creditors who would benefit from his efforts.

We note that the Bank presented no evidence at trial which tended to rebut any of the facts relied upon by this court in concluding that the applicable statute of limitations had not run on the Debtor's claims. It therefore appears that the legal analysis in *Opinion I* is sound and has not been further questioned by the Bank. Therefore, we reiterate our conclusion that the statute of limitation has not run on the Debtor's claims.

After trial, the parties were permitted to simultaneously file opening post-trial briefs by October 11, 1996, and reply briefs by October 25, 1996. After reviewing the parties' opening briefs, we entered an order of October 16, 1996, stating as follows as to issues which they should address in their respective reply briefs:

2. It appears to the court that the Plaintiffs are seeking to measure their damages in a manner quite different from that set forth in the Complaint *or* the Amended Complaint. Is there an agreement that they may amend their Complaint once again to do so? If not, can damages be so measured unless and until leave of court to so amend the Complaint is granted?

3. The Debtor's brief argues that the "Plaintiff" is entitled to monetary damages. Are not any damages collectible payable exclusively to the Plaintiff Trustee rather than to the Debtor?

4. Can the parties (or any of them) agree to any arrangement whereby the real property in issue can be sold within a definite period of time and the proceeds allocated among the Defendant, the Trustee, and the Debtor's creditors (or in some other fashion)?

5. Would the parties (or any of them) desire to return to the Mediator to determine whether he could now assist them in attempting to resolve the matters?

In its reply brief the Debtor stated that the measure of damages asserted in their initial post-trial brief was impliedly consented to by the Bank because it was raised in the pre-trial mediation process, and therefore the Debtor should be allowed to amend its Complaint to conform to the evidence under Rule 15(b) of the Federal Rules of Civil Procedure ("F.R.Civ.P."). Upon apparently recognizing that otherwise the Trustee would be entitled to receive any monetary damages awarded to the Plaintiffs in the Proceeding, the Debtor also expressed, for the first time, an intention to convert the instant case to a Chapter 11 case, which became memorialized in a motion of October 30, 1996, to effect such a conversion ("the Conversion Motion"). As to the Debtor's damage measurement, the Bank argued that the Debtor should be barred from amending its complaint post-trial because the Bank would be unfairly prejudiced in light of the fact that it was unable to present evidence to challenge the Debtor's new theory. Both parties agreed to another attempt at mediation to resolve their dispute.

The mediator was hence reappointed and a status hearing to monitor his efforts was scheduled on November 21, 1996, the same day as a hearing on the Conversion Motion. Upon advice that day that mediation was again unsuccessful, we indicated our intention to enter an Order of November 22, 1996, allowing the Debtor to file a second amended complaint setting forth the new measure of damages on or before November 25, 1996, and allowing the Bank to present evidence to challenge this measure of damages and a hearing on the Conversion Motion on the date of the hearing already scheduled on an objection filed by the Debtor to the Bank's proof of claim ("the Objection"), December 17, 1996. The Debtor proceeded to timely file a Second Amended Complaint which reiterated the prior allegations regarding damages due to lost rentals and loss in value due to the sheriff's sale, but tacked on to its prayer for relief its lost opportunity damages calculation of $330,157.07.

On December 2, 1996, we issued an order providing, in pertinent part, as follows:

upon review of the case law relevant to the [Conversion Motion], in light of this court's sense that disposition of the [Proceeding] has been pending for an excessive period of time and that its resolution may be dependent on the Chapter of the Bankruptcy Code under which the main case will proceed, it is hereby ORDERED as follows:

1. The Conversion Motion is GRANTED, as it appears that it is a matter of right under 11 U.S.C. § 706(a), subject to a motion to re-convert the case to a Chapter 7 case, after notice and a hearing. *See In re Finney,* 992 F.2d 43 (4th Cir.1993); *In re Martin,* 880 F.2d 857, 858–59 (5th Cir.1989); *In re Mead,* 28 B.R. 1000, 1002–03 (E.D.Pa.1983); and 4 COLLIER ON BANKRUPTCY, ¶ 706.01, at 706–2 (15th ed. 1996).

2. Any interested party, including the Plaintiff Trustee and the United States Trustee, may file a motion to re-convert this case to a Chapter 7 case on or before December 6, 1996. Any such motion shall be scheduled for a hearing on December 17, 1996, in lieu of the hearing scheduled on the Conversion Motion on December 17, 1996, per our Order of November 22, 1996 ("the 11/22 Order").

3. In response to any such motion and, in the absence of any such motion, this court will *sua sponte* require that the Debtor demonstrate that it can propose a confirmable Chapter 11 plan and how such a plan will relate to the outcome of the Proceeding at that hearing. If the Debtor satisfies the requirement of being able to propose a confirmable plan, a deadline for filing and serving a plan and an accompanying disclosure statement will be established at that hearing.

4. In all other respects, the 11/22 Order shall remain in full force and effect. Specifically, with respect to the Proceeding, the Defendant shall be prepared to present any rebuttal to the Debtor's present allegations of the measurement of its damages, and any disputes as to any aspects of the Defendant's proof of claim not in issue in the Proceeding shall be resolved at the hearing of December 17, 1996.

At the supplemental trial/hearing on December 17, 1996, the Bank called only Joel as a witness. Joel explained that he failed to accept Curcio's offer because he believed that he could not sell the Property in light of the February Sale. He also expressed a belief that, had the Bank given him a clear opportunity to sell to Curcio for $325,000, he would have done so.

We also were advised that, on December 4, 1996, the Bank had filed the Motion before us, seeking permission once again to sell the Property at a sheriff's sale. The Debtor's counsel expressed no opposition to the Motion on December 17, 1996. Joel explained this lack of opposition by indicating that he believed that the Property could not presently be sold for an amount in excess of the secured claims against it and that it was worthless to him. His attempts to forestall the sale through this and earlier bankruptcies were explained as motivated solely to prevent deficiency judgments from being entered against him and his aged father, who had apparently guaranteed the loan, which would jeopardize his and his parents' respective homes.

Insofar as a plan, the Debtor offered only vague intentions to pay his creditors with proceeds recovered in this Proceeding. The parties desired to continue the hearing on the Objection to the Bank's claim to the date of the scheduled hearing on the Motion, January 7, 1997. We also carried along the hearing to require the Debtor to demonstrate an ability to prepare a confirmable plan until January 7, 1997.

On the latter date the parties stipulated that the Bank's secured claim could be fixed at $200,000. The Debtor answered and now opposed the Motion. As a record on which to decide it, the parties stipulated that Cantor's claim, among those referenced at page 172, n. 1 *supra,* with interest, would be fixed at $56,377.54, and had priority to the Bank's secured claim. Delinquent real estate taxes were agreed to total approximately $96,000. The Karpowitz debt, also referenced at page 172, n. 1, *supra,* was described as secured only by a lien on the Debtor's residential property, and hence did not appear entitled to any priority under the Bankruptcy Code.

No outline of a chapter 11 plan was proffered. It was again suggested that, despite this court's disclaimers, an award of damages in the Proceeding might support the funding of a plan. Although we indicated an intention to merely condition relief to the Bank at this time and decide the Proceeding shortly thereafter, we have decided to attempt to

resolve all of the outstanding matters in the instant decision.

## C. DISCUSSION

a. *The Bank Breached a Legally Enforceable Contractual Agreement in Conducting the February 21, 1992, Sheriff's Sale of the Debtor's Property.*

The most commonly-quoted definition of a contract is that found in the RESTATEMENT (SECOND) OF CONTRACTS, § 1, at 5 (1981) ("the 2d Restatement"), *i.e.,* "a contract is a promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." A more practical definition is that it is a promise which imports a legally enforceable obligation directly assumed by or imposed on an alleged contracting party to do something. 1 C. CORBIN, CORBIN ON CONTRACTS 6 (1963).

■ There are three requisites which must be met before a court can find an existing contractual obligation. First, there must be a meeting of the minds and an intent of all parties thereto to enter into a contract. *See Irma Hosiery Co. v. Home Indemnity Co.,* 276 F.2d 212, 214 (3rd Cir.1960). Second, there must be a communicated offer and acceptance and an unconditional acceptance by the parties to the terms contained in the offer. *See Fahringer v. Strine's Estate,* 420 Pa. 48, 53, 216 A.2d 82, 85 (1966). Third, there must be valid consideration given by both parties, either by an act or forbearance or a return promise which is bargained for and given in exchange for that promise. *See Thomas v. R.J. Reynolds Tobacco Co.,* 350 Pa. 262, 266, 38 A.2d 61, 63 (1944). A promise unsupported by consideration is *nudum pactum* and unenforceable at law. *See Stelmack v. Glen Alden Coal Co.,* 339 Pa. 410, 414–15, 14 A.2d 127, 129 (1940).

■ Additionally, the agreement of the parties must be sufficiently definite that their intention may be ascertained to a reasonable degree of certainty, although it is well settled that the terms of a contract need not be expressed with complete exactness. *Kirk v. Brentwood Manor Homes, Inc.,* 191 Pa.Super. 488, 492–93, 159 A.2d 48, 51 (1960).

Also, the " '[t]he law does not favor, but leans against the destruction of contracts because of uncertainty. Therefore, the courts will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained.' " *Rossmassler v. Spielberger,* 270 Pa. 30, 41, 112 A. 876, 880 (1921), quoting 6 RULING CASE LAW 645 (1915).

■ In the instant case, the three prerequisites for the determination of a contract exist as to the Bank's agreement to postpone the February Sale. Furthermore, the intent of the parties and the surrounding circumstances lead us to find that the Debtor and the Bank entered into a binding contract to, at minimum, forbear from allowing the February Sale to go forward. However, the length of time which the Defendant would forbear for re-listing the Property remains unresolved. The 2d Forbearance was the result of discussions between Joel, Reagoso, and Higgins, wherein there was a "meeting of the minds" with respect only to removing the Property from the February Sale list, or any listing of which Reagoso had not first notified Higgins. As the Debtor contends, the February 4, 1992, letter from Reagoso to Higgins is conclusive that an offer and acceptance was made between the parties as to this element. The letter states that "if the shopping center is not sold within six months of the date of sale of the [Maple Properties] transaction, and/or [the Debtor] does not come up with the required amount of cash, the [P]roperty will be sheriff's sold."

■ There was also sufficient consideration present for this contract to be enforceable. It was discussed by the parties that the Bank would receive the proceeds from the sale of the Maple Properties in exchange for the Bank's promise to forbear from selling the Property at the sheriff's sale. The parties abided by that part of the contract despite the February Sale, the Debtor remitting to the Bank and the Bank accepting same irrespective of the occurrence of the February Sale. These actions reflect an indication of all parties that they accepted the terms of a contract that the Bank would forbear from conducting the February Sale.

Forbearance agreements have been recognized as legitimate contracts. *See Hays Run Associates v. Browning–Ferris, Inc.,* 1996 WL 460044, at *3–*6 (E.D.Pa. August 9, 1996); *In re Trans World Airlines, Inc.,* 180 B.R. 389, 401–02 (Bankr.D.Del.1994), *aff'd in part & rev'd in part,* 203 B.R. 890 (D.Del. 1996); *Kefover v. Potter Title & Trust Co.,* 320 Pa. 51, 58, 181 A. 771, 774 (1935); *Schroyer v. Thompson,* 262 Pa. 282, 285, 105 A. 274, 275 (1918) (forbearance from suing is adequate consideration); and *Crown v. Cole,* 211 Pa.Super. 388, 392, 236 A.2d 532, 534 (1967) (promise to forbear from prosecuting a lawful claim may be a sufficient consideration for a promise).

 The Bank argues, quite unconvincingly, that it never agreed to take the Property off the February Sale list and that the February 4 letter was not intended to recite that the Property would be removed from the February Sale list. Where the existence of a contract is in issue, the intent of the parties is controlling and will be determined by the surrounding circumstances. *In re Miller's Estate,* 43 WASHINGTON CO. RPTS. 230, 240–41 (Washington Co. C.P. 1963). "[A] party may be bound by his words or conduct, without any intention to assume legal obligation if the words or conduct are such that a reasonable man of ordinary carefulness and intelligence would understand that such was his intention." *Gallo v. Howard Stores Corporation,* 145 F.Supp. 909, 912 (E.D.Pa.1956), *aff'd,* 250 F.2d 37 (3d Cir.1957). Thus, a course of conduct can result in an implied contract where the conduct of the parties occurs under circumstances which, according to the ordinary course of dealing and common understanding to men, show that there was a mutual intention to enter into a contract. *Westinghouse Electric Co. v. Murphy, Inc.,* 425 Pa. 166, 171–72, 228 A.2d 656, 659 (1967). This court concludes that there was an agreement between the Debtor and the Bank to remove the Property from the February Sale list, based on Reagoso's actions and the circumstances surrounding the agreement.

At trial, Reagoso testified that his understanding of the Agreement was that, if the Maple Properties sale did not take place by January 31, 1992, the Bank would sell the Property at the February Sale. He further testified that the only reason that he did not appear at the February Sale to represent the Bank's interests was because the date was erroneously omitted from his calendar, not because he was unaware that the sale was going to take place. However, the court finds that Reagoso's testimony about the Bank's intentions to sell the Property at the February Sale are inconsistent with Reagoso's surprise in learning of the sale on March 4, 1992, when he received a phone call from the party who purchased the Property. This version of the facts would also reflect a breach of Reagoso's agreement with Higgins that Reagoso would provide Higgins with specific notice of any scheduled sheriff's sale before it occurred.

Reagoso's recognition at the time that the sale should never have taken place is also consistent with the petition he filed to set aside the sheriff's sale that day in which he wrote, "[t]hrough inadvertence the matter was never taken off the sheriff's sale list." At trial Reagoso testified that the "inadvertence" referred to in this passage was not that the Property was mistakenly left on the sale list, but rather his failure to attend the February Sale. However, this attempted revisionist version of the facts is inconsistent with the aforesaid allegation. There is no way to read the foregoing quotation as a statement that the Bank's only inadvertence was not having its representative attend the February Sale. Moreover, Reagoso's February 4, 1992, letter makes reference to the Property being "sold within six months of the [Maple Properties sale] transaction," a reference inconsistent with Reagoso's contention that the Property was expected to be sold at a sheriff's sale just seventeen (17) days later. Therefore, this court can only conclude that the Bank, per Reagoso, did agree to remove the Property from the February Sale list based on Reagoso's actions and reactions regarding the February Sale of the Property, and that the Bank's allowing the February Sale to occur constituted a direct breach of that contract.

b. *The Debtor Was Properly Allowed Leave to Amend its Complaint to Assert a Theory of Damages Based on Its Lost Sale Opportunity in February 1992.*

Having concluded that there was a legally enforceable agreement between the Debtor and the Bank whereby the latter would forbear from selling the Property at the February Sale, the next issue we will address, briefly because we have already decided it, is explanation of the basis for our decision that the Debtor was granted leave to amend its complaint to assert a theory of damages based on the Debtor's loss of its alleged opportunity to sell the Property in February 1992 as a result of the February Sale.

In its two pre-trial Complaints, one filed just before trial on September 9, 1996, the Debtor requested that we measure its damages on the basis of rents lost and depreciation of the Property as a result of the February Sale. Our discussion at pages 178–80 *infra* reflects our skepticism that any damages based upon loss of rents were proven.

The Debtor, too, appears to have recognized his failure to present proof necessary to support changes on the theories asserted in the initial Complaint and the Amended Complaint of September 9, 1996. Thus, the Debtor posited a completely new theory for measurement of its damages in argument at the close of trial and in its post-trial brief. This new theory of damages is based on a breach of contract theory, while the former claims were tort-like damages resulting from the Bank's alleged wrongful conduct. This court, in its Order of November 22, 1996, allowed the Debtor to amend its Complaint a second time to include the measure of damages based on its lost sale opportunity because justice so requires and his leave to amend was granted subject to conditions which minimized any unfair prejudice to the Bank.

Federal Rule of Bankruptcy Procedure 7015 incorporates the F.R.Civ.P. 15(a), which provides, with respect to amended pleadings, that, "leave shall be freely given when justice so requires." Leave to amend a complaint is properly to be denied only in narrow classes of cases. "Delay alone, is an insufficient ground upon which to deny a motion to amend.... Rather the touchstone is whether the non-moving party will be prejudiced if the amendment is allowed." *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984), citing *Cornell & Co. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978). Other factors that may weigh against granting leave to amend a complaint include undue delay, bad faith, a dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of amendment, and futility of the amendment. *See Strange v. Nationwide Mutual Insurance Co.,* 867 F.Supp. 1209, 1220 (E.D.Pa. 1994), quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Topol v. Trustees of University of Pennsylvania,* 160 F.R.D. 474 (E.D.Pa.1995); and 3 J. MOORE, FEDERAL PRACTICE, ¶ 15.08(4), at 15–64 to 15–81 (2d ed. 1996). Also, leave to amend is properly denied when the "plaintiffs [are] asserting a new theory," forcing the defendants to prepare a mid-trial defense on new issues. *Johnson v. Trueblood,* 629 F.2d 287, 295 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981).

In the present case, the Debtor sought to amend its complaint to include a new theory of damages after the trial. However, the amendment did not alter or add to the facts presented by the Debtor at trial, but rather simply added additional claims arising out of the same circumstances already proven. In *Wessling v. Latkanich,* 144 Pa.Super. 317, 319, 19 A.2d 553, 554 (1941), the court noted that, "after the statute of limitations has run, a plaintiff may not introduce a new cause of action, ... but he may amend by the introduction of an additional element or an added claim of damage arising from the same circumstances (*Armstrong & Latta v. Philadelphia,* 249 Pa. 39, 94 A. 455) ... so long as the same negligence is charged as that set out in the original statement." *Cf. In re Cohen,* 139 B.R. 327, 332–36 (Bankr.E.D.Pa.1992) (an amendment to a

complaint which merely changes the legal theory applied to the same unchanged factual averments is permitted to relate back to the time of the filing of the complaint).

Although the instant amendment comes late in the proceedings, it is not so late as after the briefing was completed or a decision was rendered. Moreover, delay alone is not enough to deny leave to amend a complaint absent a showing of prejudice. The Bank cannot realistically assert prejudice in allowing the amendment because the Order of November 22, 1996, allowed the Bank to recall Joel to testify and to present any other evidence designated by December 13, 1996, to challenge the Debtor's new theory of damages. Moreover, neither the record, nor the Bank, indicate any evidence of bad faith on the part of the Debtor.

Although these proceedings will not be considered as part of the record, the Debtor did apparently hypothesize this measure of damages during the mediation process. Hence, the Bank should not have been surprised that the Debtor would assert this new theory of damages. Furthermore, the fact that the Bank adduced only brief testimony from Joel on December 17, 1996, attests to a lack of unfair prejudice to the Bank in not being advised of this means of measuring damages sooner. As a result, our granting the Debtor leave to amend the complaint to alter its theory of the measurement of its damages was proper.

c. *The Debtor Was Unable to Prove Its Originally–Asserted Damages Relating to Lost Rents and Depreciation of the Value of the Property as a Result of the Sale with the Requisite "Reasonable Certainty."*

Having resolved the preliminary questions concerning the existence of a contract and allowance of the Debtor to amend its complaint to assert a new measure of damages, we now turn to consider what damages, if any, the Debtor has proven. Generally, the Debtor argues that the Bank's failure to take the Property off the February Sale list, as agreed in the 2d Forbearance, caused the Debtor harm for which it seeks to be compensated.

In order to recover in a breach of contract action, the plaintiff has the burden of proving that the defendant's actions were the proximate cause of the plaintiff's injury and that the injury caused by the defendant's actions was foreseeable. *See In re 222 Liberty Associates,* 101 B.R. 856, 863 (Bankr. E.D.Pa.1989); and *In re Direct Satellite Communications, Inc.,* 96 B.R. 507, 515–516 (Bankr.E.D.Pa.1989). The RESTATEMENT OF CONTRACTS, § 330, at 509 (1932), states that,

> [i]n awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury.

*See also* 2d Restatement, § 351, at 135–36. After these elements are shown, the plaintiff is required to prove the amount of damages by proper evidence with "reasonable certainty," and the court may itself compute damages which are to be appropriately awarded when damages are established. *222 Liberty Associates, supra,* 101 B.R. at 863.

We find it evident that the Bank's breach of the forbearance agreement, resulting in the February Sale of the Property, was the proximate cause of some damages to the Debtor. However, the difficult issue is distinguishing the compensable damages from the Debtor's self-inflicted damages to the Property resulting from its long-standing neglect of the Property and Joel's inability to sell the Property even though reasonable offers were available to him, at least one of which remained on the table even after the February Sale. On the other hand, the record indicates that the 2d Foreclosure was expressly entered into for the sole purpose of forestalling the sale of the Property until, at least, the sale of the Maple Properties was concluded. The Bank knew that the Debtor was attempting to privately market the Property, though unsuccessfully, and a breach of the 2d Forbearance, leading to the February

Sale, would naturally interfere with the Debtor's expressed intentions to effect a private sale at a fair market price. Thus, the court concludes that some damages were foreseeable and were an immediate result of the Bank's breach of the forbearance agreement. Therefore, the Bank's breach of a legally enforceable contract entitles the Debtor to some damages, but only to the extent that those damages were foreseeable by the Bank and the Debtor proved these damages with "reasonable certainty."

■ In their Second Amended Complaint, although its argument seeking to add a new theory of damages may be interpreted as an abandonment of same, the Debtor continues to claim damages for uncollected rents in the amount of $195,200. The Debtor has the burden of proving these damages with "reasonable certainty."

■ In this instance, the Debtor has clearly failed to meet its burden. With respect to the Medicine Shoppe, the Debtor claims uncollected rents of $62,400 over 48 months. However, McGovern, the owner of this business in the pertinent time-period, testified that his lease ended in March of 1990 and that he moved out of the space in September of 1991, prior to the February Sale. The Defendant's breach therefore in no sense caused the Debtor's uncollected rents from that business.

■ The Debtor also claims uncollected rents in the amount of $78,000 over 60 months from Pizza Party. Farhat, the owner of Pizza Party, testified that he made rent payments up until the February Sale, after which he received a notice from Reagoso not to make any more payments because of the ownership dispute. The record indicates that rent payments were made intermittently to the Debtor by Farhat even after the February Sale. The last payment was made on January 19, 1993, to the Debtor. While the Bank's breach may have interfered to some degree with the Debtor's ability to collect rents from Farhat, it must be recalled that Farhat was the purchaser of the Maple Properties, whose delay in settlement had arguably caused the February Sale to occur.

The nature of the Bank's interference with Farhat's rent payments is at best uncertain.

The Debtor was at all times on friendly terms with Farhat and even frequented the restaurant, but, perhaps because of Farhat's own involvement with the Debtor's dealings with the Bank and perhaps because of his acknowledged nonfeasance as a landlord, the Debtor made no attempts to collect rent from Farhat, even after the February Sale was set aside in July 1993. The foregoing sequence of events fails to establish the requisite cause and effect between the February Sale and the Debtor's failure to collect rents from Farhat.

■ Lastly, the Debtor claims damages for uncollected rents from Contemporary Styles in the amount of $41,600 over a 32–month period. Here again, the Debtor clearly failed to prove its claim. Mattero, the owner of this business, testified that she moved into the space in February 1994, more than two years after the February Sale was set aside. She also stated that, at that time, she discussed paying a monthly rent of $800 to the Debtor with Joel, but a lease was never signed. In addition, Mattero made her own repairs to the space, totaling $5,400, and the Debtor has never attempted to collect rents from her after Mattero stopped making payments due, again, to the Debtor's nonfeasance as a landlord. Mattero was therefore not a tenant of the Property during the period of the ownership dispute. Part of the uncollected rents which the Debtor is claiming were owed by the previous tenant, whose business Mattero had worked for, but had not actually succeeded.

■ Finally, the Debtor has offered no evidence concerning uncollected rents from one Samuel Dabbundo, who is referenced in the Complaint as owing rents in the amount of $13,200. Consequently, we find, with little hesitancy, that the Debtor has made out no case at all regarding rent claims lost as a result of the February Sale.

■ The Debtor also continues to aver in its Second Amended Complaint that it is entitled to damages for the decline in value of the Property. On this point, the Debtor argues that, due to the ownership dispute between February 1992 and July 1993, the Bank neglected its alleged duty to maintain the Property, causing it to fall into disrepair.

██ Initially, we find that the Bank had no such duty of maintenance. And, if it did, there is no indication that it left undone any maintenance which the Debtor would have done, it being doubtful that the Debtor would have done any maintenance in this period since it did none at any other time before or after this period.

The Debtor calculates its loss of value damages by measuring the decline in value of the Property as the alleged difference between the market value of the Property before the breach on March 3, 1992, of $400,000, and a value on February 28, 1996, of $200,000, minus maintenance costs of $40,000, or $160,000. The first figure is based on an appraisal of the Property as of March 21, 1992, submitted by the Bank's witness, McCloskey. However, the Debtor is not willing to accept McCloskey's subsequent assessment that, while the value of the Property declined to $300,000 in October 1993, it has again risen at present to $400,000 by reason of market forces unrelated to the Property's persistent deterioration at the hands of the Debtor.

██ There is no evidence on the record to support the market value of $200,000 on February 28, 1996, asserted by the Debtor in its Complaint. At trial, the Debtor presented testimony of Gilbert, who stated that the present value of the Property was $225,000. However, we find the testimony of Gilbert suspect because his appraisal was performed under circumstances which would unfairly produce a low appraisal. Gilbert testified that his son is currently interested in purchasing the Property, and that the appraisal was a reflection of how much he advised his son to pay for the Property, which would naturally be the lowest possible price. "The fact that a witness is interested in the result of the action or proceeding in which he testifies, or is biased or prejudiced in favor of or against any of the parties thereto, is proper to be shown and considered as bearing on credit which should be accorded to his testimony.... Testimony from an interested witness need not be believed and cannot be accepted as conclusive, especially where a matter of opinion or judgment, or uncorroborated, or where contra-dicted by circumstances in evidence, or by testimony of other witnesses." 98 C.J.S. 476–78 (1939). "The force and relative weight of [expert] opinion evidence may be weakened by circumstances showing interest or bias on the part of the witness." 31A AM.JUR.2d 139 (1989).

While Gilbert's criticism of McCloskey's reliance on sales of other property as an unreliable barometer of a "tremendous growth pattern" in the area, and the effect of this growth pattern on the particular Property in issue, appear to have some merit, we clearly find McCloskey the more reliable source. As a result, we measure the current market value of the Property as approximately $350,000. Using this figure as applied to the Debtor's calculation method, the decrease in market value would be the value of $400,000 before the sheriff's sale and the present value of $350,000, minus repair costs of $40,000 which would equal only $10,000.

We must, however, note that even this, or any, reduction in value is largely due to the Debtor's own neglect of the Property's need for repairs, which has persisted for the entire period that the Property was in the hands of the Debtor over the past decade. We doubt whether the February Sale was any factor at all, and particularly not a significant factor, the magnitude of which, standing alone, was in any sense quantified in this record, in effecting depreciation of the Property's value due to the lack of maintenance. We would therefore be compelled to decline any award of damages based on the deterioration of the Property between 1992 and the present.

██ In the initial Amended Complaint the Debtor added, *inter alia,* claims for attorneys' fees and costs necessary to successfully contest and set aside the February Sale. Attorneys' costs and fees are generally not allowed as an element of damages in the absence of an express statutory allowance, or clear agreement by the parties, or some other established exception. *See Key Tronic Corp. v. United States,* 511 U.S. 809, 814–16, 114 S.Ct. 1960, 1965, 128 L.Ed.2d 797 (1994); *In re Barrett,* 136 B.R. 387, 394 (Bankr. E.D.Pa.1992); and *Chatham Communications, Inc. v. General Press Corp.,* 463 Pa. 292, 300–01, 344 A.2d 837, 842 (1975). But " [w]here the wrongful act of defendant has involved plaintiff in litigation with others or

placed him in such relation with others as makes it necessary to incur expenses to protect his interests, such costs and expenses, including attorney's fees, should be treated as legal consequences of the original wrongful act, and may be recovered as damages.' " *Blum v. William Goldman Theatres, Inc.*, 69 F.Supp. 468, 470 (E.D.Pa.1946), *modified,* 164 F.2d 192 (3d Cir.1947), quoting 15 AM. JUR. 552 (1938). Therefore, we will allow the Debtor to recover those attorneys' fees connected with setting aside the February Sale of the Property to the Debtor.

There is some question as to the proper measure of such damages. The Bank concedes that at least $2,000 is reasonable. The Debtor claims $5,000. There is evidence that the Debtor or Joel owes a much larger bill to Higgins, in the amount of $15,000. However, it is unclear how much of this bill was attributable to services in connection with Higgins' services directed towards setting aside the February Sale. Noting that the Bank took the laboring oar on this issue, as noted by Reagoso's immediate petition seeking to set aside the Sale, apparently due to its (at that time) admitted error in allowing the February Sale to proceed, we believe an award of $3,500 for this purpose would be appropriate.

d. *The Debtor Is Likewise Unable to Prove the Damages Which It Now Asserts Arose from Its Lost Opportunity to Sell the Property.*

We now turn to the Debtor's present asserted measure of damages. These figures, which have not changed between the end of the trial on September 20, 1996, and the prayer for relief in the Second Amended Complaint, filed on November 25, 1996, are as follows:

| | | |
|---|---|---|
| | Property's Fair Market Value on 3/31/92 | $400,000.00 |
| (less) | Mortgage Balance as of 2/21/92 | (140,000.00) |
| (less) | Real Estate Taxes Due as of 2/21/92 | (40,000.00) |
| (less) | Herb Cantor Tax Lien | (48,812.72) |
| | Sub Total | $171,088.28 |
| (plus) | Attorney Fees (Set Aside Petition) | 5,000.00 |
| (plus) | Payments to Bank made after 2/21/92 | 48,871.73 |
| | Sub Total | $225,060.01 |
| (plus) | Interest (6%, 4/5 years) | 67,597.06 |
| (plus) | Attorney Fees & Costs for Bankruptcy | 37,500.00 |
| | TOTAL | $330,157.07 |

Our critique of the figures offered begins with the observation that the Debtor offered no evidence that the Property would have sold for $400,000 in February 1992, except McCloskey's appraisal, the update of which by its author the Debtor is unwilling to accept. We conclude that, in reality, the Debtor is engaging in wishful thinking in contending that the Property could have sold for that amount in February 1992.

The Debtor produced testimony from two potential buyers whose offers fell far short of the $400,000 figure. Cassey indicated that he would have begun negotiations if the Debtor had lowered its demands to $350,000. Joel never did reduce his demand to that figure, and therefore any coming together between the Debtor and Cassey would necessarily have been extremely speculative.

The other potential buyer, Curcio, testified that he executed a sales agreement for the Property dated April 6, 1992, for $325,000, and sent it to Joel. Curcio also testified that he was pursuing the sale aggressively and the fact that the Property had been subject to the February Sale was not of consequence to him in making his offer. The record indicates, however, that Joel, acting for the Debtor, did not sign the sale agreement.

At the hearing on December 17, 1996, Joel attempted to explain why he did not do so. He stated that he "was led to believe that [he] couldn't sell the property" because of the February Sale. He then proceeded to explain, in a general way, that the series of sheriff's sales and tax sales scheduled for the Property had made it difficult for him to negotiate with any prospective buyer because the prospects always assumed that they could get the Property more cheaply at a forced sale than by negotiating with him. This is the substance of what Cassey indicated he considered in his efforts to obtain the Property. However, Curcio made no such statements. In the absence of any testimony or other indications that Joel in any way responded to Curcio, it is open to speculation as to what could have transpired had he attempted to do so.

The burden was squarely upon the Debtor to show that the actions of the Bank caused the potential sale to Curcio (or some other buyer) to be frustrated. The Debtor failed to meet this burden. We were left with the distinct impression that Joel made no response whatsoever, explanatory or otherwise, to Curcio, and that this failure on his part was the direct cause of the frustration of this transaction. We suspect that, despite Joel's attempts to deny same with the wisdom of hindsight, he considered Curcio's offer too modest to pursue. We certainly cannot find that the Bank could have foreseen that Joel was thusly inclined to fritter away a reasonable offer for the Property. We therefore refuse to conclude that the February Sale was the cause of the Debtor's failure to sell the Property to Curcio for $325,000.

It also strains credibility to believe and therefore conclude that, although Joel was unable or unwilling to sell the Property prior to February 21, 1992, *and* at all times after July 1993, he would have effected a sale in or shortly after the time of the February Sale if only that Sale had not taken place. It is therefore not only unclear but also it is doubtful that a sale would have actually occurred in February 1992 whether the February Sale had taken place or not. The February Sale was not an issue in affecting the willingness of Curcio to make the purchase. There is no evidence of any other buyers. There is no evidence that Joel was prepared to follow through with any buyers.

There are other problems with the Debtor's prototype of using a hypothetical private February sale of the Property to measure its damages. The fact that the sale was not consummated in February 1992 allowed for an upside potential in favor of the Debtor which otherwise would have been eliminated. Had the Debtor made any effort to maintain the Property, it could have realized post-February 1992 rentals from it. Also, it has not been disproven that McCloskey's opinion that a "tremendous growth pattern" in the area has not in fact caused the value of the Property to increase. Had the Property been sold in February 1992, this growth potential would have been lost.

The Debtor's attempt to measure damages based on a hypothetical sale of the Property is reminiscent of the plaintiff's efforts in *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 500 F.Supp. 1312, 1317 (W.D.Pa.1980). In that case, the court denied the plaintiff's expectation damages for the difference between the value of a building sold at foreclosure and the value of the building had the defendants not breached, finding that there was "nothing more than unsupported allegation" that the building was worth more than the amount found by the state court and a real estate consultant firm at the time of foreclosure. *Id.* Similarly, in the instant case, the Debtor alleges that the Property would have sold for $400,000 but offers no evidence to prove that or any other selling price would have resulted in a consummated sale of the Property at that time with the requisite "reasonable certainty." Thus, it appears very difficult for the Debtor to argue that it can base its lost opportunity damages on that or any other figure which posits the occurrence of a private sale of the Property in February 1992.

e. *The Damages Awarded Will Be Limited to the $3,500 Recovery for Attorney's Fees and Conditioning the Bank's Relief from the Automatic Stay on the Waiver of Any Potential Deficiency Claims.*

We nevertheless believe that it is appropriate that some damages be awarded to the Debtor on account of the failure of the Bank to abide by its contract to forbear from allowing the February Sale to take place. The only element of damages proven with any degree of certainty is, however, that the Debtor is entitled to a $3,500 for attorneys' fees incurred in attempting to undo the sale. We do believe that additional damages are justified, but we are somewhat at a loss as to how to measure them. As is indicated at pages 178–82 *supra,* we cannot accept any of the methods of measurement suggested by the Debtor except the $3,500 attributable to its attorneys' fees.

The other relief which we are prepared to grant requires us to briefly discuss the Bank's Motion for relief from the

automatic stay to foreclose upon the Property. Although we were not prepared to rule from the bench on this issue on January 7, 1997, we must now observe, after reviewing the applicable law, that the Bank appears entitled to such relief. The Debtor has no equity in the Property unless we accept McCloskey's present appraisal estimate of $400,000 at face value. The liens against the Property, even with the Bank's claim reduced to $200,000, total in excess of $350,000. *See* pages 174–75 *supra.* As we find at page 180 *supra,* the value of the Property is about $350,000. The Debtor therefore has no equity in the Property for purposes of 11 U.S.C. § 362(d)(2)(A). *See In re Indian Palms Associates, Ltd.,* 61 F.3d 197, 206–09 (3d Cir. 1995).

■ The Debtor can therefore prevent relief under 11 U.S.C. § 362(d)(2) only by showing that the Property is necessary for an effective reorganization. *See id.* at 208–09; and *In re Siciliano,* 13 F.3d 748, 751 (3d Cir.1994). The Debtor has made no showing that any Chapter 11 reorganization is possible, having provided no conception of any potential plan of reorganization despite this court's warning that such a showing was at issue on both December 17, 1996, and January 7, 1997. Relief under § 362(d)(2) should therefore be granted to the Bank. *See, e.g., In re Swedeland Development Group, Inc.,* 16 F.3d 552, 567–68 (3d Cir. 1994) (en banc); *Indian Palms, supra,* 61 F.3d at 208; *In re Wynnefield Manor L.P.,* 163 B.R. 53, 61 (Bankr.E.D.Pa.1993); *In re Gulph Woods Corp.,* 84 B.R. 961, 974 (Bankr. E.D.Pa.1988); and *In re 6200 Ridge, Inc.,* 69 B.R. 837, 842–43 (Bankr.E.D.Pa.1987). The Debtor's inability to present a confirmable plan also results in a lack of adequate protection of the Bank's interests and gives rise to cause for relief under 11 U.S.C. s 362(d)(1). *See, e.g., In re Calvanese,* 169 B.R. 104, 114–15 (Bankr.E.D.Pa.1994); *Wynnefield Manor, supra,* 163 B.R. at 61; *Gulph Woods, supra,* 84 B.R. at 974–75; and *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376, 388–89 (Bankr.E.D.Pa.), *aff'd,* 75 B.R. 819 (E.D.Pa.1987).

The Debtor's only vague prospects for any sort of reorganization appear dependent on its obtaining a very substantial monetary recovery in the Proceeding. In light of our rendering a decision foreclosing that possibility in this very Opinion, that prospect is eliminated. *Compare In re Ames,* 973 F.2d 849, 851 (10th Cir.1992), *cert. denied sub nom. Ames v. Sundance State Bank,* 507 U.S. 912, 113 S.Ct. 1261, 122 L.Ed.2d 658 (1993); and *In re Cherry,* 84 B.R. 134, 138–39 (Bankr.N.D.Ill.1988) (funding a plan through doubtful litigation deemed infeasible).

■ During the hearing of December 17, 1996, Joel admitted that he had no real prospects for developing the Property or for selling it for a price in excess of the liens against it. He explained his efforts to prevent foreclosure of the Property as motivated in large part by his desire to avoid the entry of a deficiency judgment against him or his father which would jeopardize the homes of his parents and/or himself. We believe that an appropriate measure of additional damages to the Debtor imposed due to the Bank's wrongful conduct is therefore to serve this purpose by requiring the Bank to waive any deficiency claims, as well as pay the $3,500 damages which we deem appropriate, as conditions for granting the Bank relief from the automatic stay.

■ We believe that such a decision, to the extent that it could be deemed a "conditional verdict," is permissible in such an equitable proceeding. *See 222 Liberty Associates, supra,* 101 B.R. at 865. We also note that § 362(d) expressly authorizes the "conditioning" of the automatic stay.

### D. CONCLUSION

An Order will be entered granting the Bank's Motion on the conditions that it remit the $3,500 attorneys' fees which we deem payable and that it waive any deficiencies against the Debtor or any of his relatives.